## THE NITH.

### THOMPSON et al. v. THE NITH.

*(District Court, D. Oregon. August 30, 1888.)*

1. SHIPPING—CARRIAGE OF GOODS—BILLS OF LADING—EXPLANATION.
   The term "rusty" in a bill of lading is a statement of fact, and not an article of the agreement, and is therefore open to explanation or contradiction.

2. SAME—STOWAGE—SALT OVER IRON.
   Salt should never be stowed over iron, where there is any chance that water may come through from above onto the salt.

3. SAME—CARGO AROUND MAINMAST.
   Cargo, and particularly salt, stowed around the mainmast, ought to be dunnaged away from the mast, so that if any water comes through the mast-coat it will not come in contact therewith.

4. SAME—NON-DELIVERY—MEASURE OF DAMAGES.
   The measure of damages for the non-delivery of goods is their value at the port of destination, with interest on that amount from the time the delivery ought to have been made.

5. SAME—BILL OF LADING—BURDEN OF PROOF.
   The bark Nith received a lot of Swedish iron in bars and bundles at Liverpool for carriage to Portland, and upon its discharge here the iron was found to be badly damaged, and corroded with rust from salt water. The master signed a bill of lading for the iron in "good order and condition," with the qualification, "Bars and bundles rusty;" and it appearing that Swedish iron, at Liverpool, was generally more or less covered with a light atmospheric rust, which did not affect its commercial value, and that the usage was to insert "rusty" in bills of lading therefor from Liverpool to this port, *he'd*, the burden of proof is on the carrier to show that the iron was otherwise affected than by atmospheric rust at the time of its receipt by the vessel.

6. SAME—PERILS OF THE SEA—DILIGENCE TO REPAIR INJURY.
   Admitting that the breaking of the mast-coat during a storm, in which the decks are flooded, whereby a stream of water goes down the mast into the hold, is a peril of the sea, the exercise of proper skill and diligence would lead to the discovery of the rust, and secure the repair of the same in a less period than 12 or 18 hours.

*(Syllabus by the Court.)*

*Edward N. Deady* and *Horace B. Nicholas,* for libelants.
*C. E. S. Wood,* for claimant.

DEADY, J. The libelants, Edward J. De Hart and William Honeyman, doing business as partners under the firm name and style of Thompson, De Hart & Co., bring this suit against the British bark Nith on a contract of affreightment to recover damages in the sum of $3,700.17 for a violation thereof.

It is alleged in the libel that in February, 1887, the libelants shipped on the bark, then lying at the port of Liverpool, England, and bound on a voyage to the port of Portland, about 24 tons of Swedish iron, and 52 anvils, weighing about 7,017 pounds, in good order and condition, and worth at this port $3,700.17, upon a contract with the master thereof that, in consideration of certain freight then paid by the libelants, he would deliver said iron and anvils to them at this port in like order and condition, loss and damage from the perils of the sea only excepted; that

said iron and anvils were not so delivered, but by the misconduct of the master and his servants the same "became wetted and damaged to such an extent as to be a total loss to the libelants," whereby they are damaged in the said sum of $3,700.17, for which they pray a decree, with costs, and the arrest and sale of the vessel to satisfy the same.

On the arrest of the bark, the master, John Adair, filed a claim of ownership on behalf of Bramwell and Gardiner, and the same was delivered to him on the stipulation of John A. Brown and Thomas Hislop in the sum of $8,000.

In his answer, the master admits the receipt of the iron and anvils on January 20, 1887, at Liverpool, and the contract to carry and deliver the same at this port, and alleges generally that said articles were properly stowed and cared for during the voyage.

As to the iron, he also alleges (1) that it was damaged by rust when received on the Nith, and that the bill of lading was given therefor accordingly; and (2) that the damage was caused during the voyage by a peril of the sea, to-wit, the carrying away of the mainmast coat on April 20, 1887, "by reason of the heavy rolling and straining of the bark" in a severe storm, whereby "some water was unavoidably precipitated into the hold." As to the anvils, he admits they were "apparently in good condition," but alleges they were so encased as not to be open to inspection; that they were stowed in the hold around the mainmast, and that probably "some of the water that entered the hold" when "the seam of the mainmast coat was carried away fell upon or reached said anvils," and caused the rust, if any; which is a peril of the sea. He also alleges that the anvils are only slightly rusty, and that such rust is "the inevitable result" of the "straining of the bark on the voyage," and "the large quantities of water shipped during" the same.

The iron, which is in bundles and bars, when it reached this port was very badly damaged with rust. It is in the condition known to the trade as "froze;" that is, stuck or run together. No use can be made of it unless it is rerolled. The anvils are more or less rusty on the face, and cannot be used unless the rust is ground off. Neither is in a merchantable condition, and the carrier is liable for their value at this port, unless they were in the same condition when received, or the injury occurred during the voyage by a peril of the sea, to which the negligence or misconduct of the owner or his servants did not contribute.

The bill of lading acknowledges that the anvils were "shipped in good order and condition," to be delivered at this port in like order and condition. But the faces of the anvils were covered with canvas. The admission as to their condition is qualified by this circumstance, and, if the fact was otherwise, the carrier may show it. The words "in good order and condition," in a bill of lading, are, like the admission of any other fact in an ordinary receipt for money, open to explanation or contradiction. They do not constitute an agreement, though contained in one. *The Pacific*, Deady, 21. The admission establishes the fact, *prima facie*, that the anvils were in good order when shipped, and the burden of proof is on the claimant to show the contrary. The bill of lad-

ing for the iron, consisting of 700 bars and 777 bundles of Swedish rolled iron, weighing 24 tons and 908 pounds, admits in the printed formula that it was also "shipped in good order and condition," which admission is qualified by the addition in writing of these words, "Bars and bundles rusty."

The Nith is an iron vessel, built at Glasgow in 1860, and was once known as the "City of Shanghai." Her length is 212.5 feet, beam 32.3 feet, and depth 21.5 feet. Her registered tonnage is 990 tons, while she will carry 1,400 tons. She is divided into three compartments. The between-decks in the middle compartment is not floored over. Her cargo on this occasion consisted of 1,052 tons of "factory filled" salt in 50 and 100-pound sacks, 100 tons of coke, 2,540 boxes of tin, some crystals of soda, and the iron and anvils in question. She left Liverpool on February 7, 1887, and the voyage occupied 182 days to Astoria, and 191 to Portland. She drew 20 feet aft and 19.8 forward.

The defenses are inconsistent and hypothetical: The iron was damaged when it was shipped; but if it occurred on the voyage it was caused by a peril of the sea; which peril was also the cause of the injury to the anvils, if they were injured.

The disputed questions in the case are: (1) What was the condition of the iron when it was shipped? (2) was it rusted on the voyage, and, if so, from what cause? and (3) what caused the anvils to rust on the voyage?

And, first, the words in the bill of lading, "Bars and bundles rusty," like the words, "in good order and condition," are a mere statement of fact that is open to explanation or contradiction.

The evidence shows that this iron was brought by the steamer Sliepner from Gothenberg, Sweden, to Liverpool, and that such iron, owing, I suppose, to the humidity of the climate, is always more or less, and generally more than less, covered with a slight atmospheric rust; and that it is the usage in signing bills of lading at Liverpool for such iron destined to this port to insert therein the word "rusty." A bundle of five bars taken from a shipment of 520 bundles and bars of Swedish rolled iron, lately brought from Liverpool to this port in the vessel Roscrana, was produced in court. It is somewhat affected or colored by this thin atmospheric rust, but yet good, merchantable iron. The bill of lading given by the carrier is also produced, which first admits the iron is shipped in good order and condition, and then, referring to the whole shipment, the words, in writing, are added, "All more or less rusty."

Under the circumstances, the bill of lading must be taken and construed as meaning nothing more than that the iron was more or less covered with the atmospheric rust common to Swedish iron in that port, which did not, however, affect its commercial value. Nor does it seem reasonable or probable that a master would sign a clean bill of lading for iron in the condition which this now is, or even a much better condition, only qualified by the addition of the mild and uncertain term "rusty." The most natural thing in the world would have been to write, "very rusty;" "badly rusted."

So far, then, as the case stands on the bill of lading, the proof is that the iron, when shipped, was in the usual condition of Swedish iron at Liverpool; that is, more or less covered or colored with atmospheric rust, which did not diminish its commercial value. The burden of showing that it was otherwise rusted or thereby badly damaged, as alleged by the claimant, now rests on him.

On this point both parties have taken testimony. The claimant has introduced the deposition of the master of the Nith, taken here, and those of the ship-keeper, freight clerk, and wharfinger of the Nith, and the two stevedores and their foreman, who loaded the vessel, taken at Liverpool. They all state substantially that the iron, when taken aboard, was badly rusted and corroded, as if it had been wet with sea-water. The master adds that it lay on the quay of the Nith some days before it was shipped, because he refused to receive it on account of its condition, when word came from the shipper—but how or by whom he does not say—that the iron was bought for Portland, and must go forward "rusty or no rusty;" and that "they said" that the iron got rusty coming across from Sweden, the steamer having sprung a leak; so he "took the iron and gave them a rusty receipt;" and added, "I was quite willing to take it, as long as I protected myself."

The ship-keeper only saw a part of the iron, having kept tally for the freight clerk on the quay, where it was delivered, while the latter was at dinner.

The two stevedores, father and son, and their foreman, tell a story about the stowage of the iron that is so flatly contrary to the admitted facts of the case, that they are either mistaken about the vessel they loaded, or intentionally false in a very material matter concerning the same. The stevedores say directly, and the foreman in effect, that the iron was first stowed under the direction of the son on the floor in the wings at the main hatch, who, in doing so, said the iron was so badly rusty that there would be no harm in putting it there, and stowing salt immediately on top of it; but the father interfered, saying, "This will not do, for when the iron reaches its destination the owner will claim that the salt caused the rust;" whereupon the iron was moved to the after-hold, and stowed on the floor on either side of the mainmast, and three tiers of crates of earthenware stowed on it. And now, to prevent the salt that was afterwards stowed in front of the iron—not on top of it—from coming in contact with it, a bulk-head was made of boards and matting against the ends of the crates; and as the crates extended forward over the iron,—in the language of the witness, "overlapped it,"—there was a foot of space between the iron and the salt. The witnesses do not say, in so many words, that there was no salt stowed above the iron, but such is the necessary conclusion from what they do say as to how it was stowed, and why it was so stowed.

Now, the fact is that there were at least eight or ten tiers of 50 and 100-pound sacks of salt stowed over the iron and immediately on top of the crates; and therefore, if this statement is a falsehood, it is a lie with a circumstance. But it goes too far. And whether the witnesses are

mistaken in the vessel, or have told a falsehood about the stowage of the iron, to give an air of verity to their statements concerning the condition of the same, their testimony is entitled to but little, if any, weight.

Considering the relation of the master to the controversy, and the contradictory, reckless, and absurd statements in his testimony generally, he is not entitled to much credit on this point. This leaves the proof of the claimant to rest mainly on the testimony of the freight clerk, wharfinger, and ship-keeper,—all persons with an evident bias and sympathy for the vessel in whose employ they appear to have been at the loading of the cargo. Add to this the statement of the mate that the iron was on board the vessel when he joined it, and the surface was rusty, but he could not see it underneath, this implies, probably, that the iron was not then covered with the crates; but the witness does not say so, nor does he say that the iron was anything more than merely "rusty," which is admitted.

Against this testimony the libelants produce the depositions, taken in Liverpool, of the master, stevedore, and porter, the shipping clerk, and warehouseman, and the delivery foreman of the agents at Liverpool of the shippers of the iron at Gothenberg. They say they have had many years' experience in handling Swedish iron, and that this lot passed through their hands in their several capacities on the way from the steamship Sliepner to the Nith, and that it was in good condition for Swedish iron; that it was not corroded or scaled, but more or less covered with atmospheric rust, which would rub off with the hand. Both the delivery foreman and the freight clerk say they never heard that the master made any objection to receiving the iron; and the latter says he has shipped thousands of tons of Swedish iron in the same condition, and nothing was said about it.

The libelants also produce the deposition, taken at Liverpool, of Emil Bruhn, the chief officer of the steam-ship Sliepner, when the iron was brought from Gothenberg. He says he forwarded the iron to the Nith, and that when it left the Sliepner it was in good condition; that it was not damaged in the slightest, and, if there was any rust on it, it was atmospheric; and that he had been engaged nine years in handling Swedish iron.

On this state of the proof the only reasonable conclusion is that the iron was in good condition when it was received on the Nith, as stated in the bill of lading, barring the atmospheric rust, which did not affect its commerical value. Although the burden of proof is on the claimant to show that the iron was damaged, yet the decided weight of the evidence, considering both the number and credibility of the witnesses, is to the contrary.

The claim that the anvils were not in good condition when received on the Nith is not made out in proof. In fact, there is no evidence worth considering in support of it; and the finding must be, as stated in the bill of lading, that they were in "good condition."

The next question is, what caused the iron and anvils to rust on the voyage, and is the carrier liable for the injury caused thereby?

The evidence introduced on the question includes a protest made by the master of the Nith, the first and second mate, and the carpenter, at the British vice-consulate in this city, on September 17, 1887, and a report of the port-warden of this district, appointed under the act of June 3, 1859, of a survey of the vessel and cargo, made by him at the request of the consignees of the former on September 20, 1887. The protest was introduced by the claimant, subject to the objection of the libelants, and the report was introduced by the latter without objection.

The protest is an *ex parte* statement, not required or authorized by any statute that I am aware of. It is made by the agents of, and in the interest of, the owners; and on general principles it is not competent evidence for them, though it may be used against them. It purports to be written by a third person, and not one of the "appearers." It is said to be made from the log, but the book is not produced. 1 Greenl. Ev. § 495; 1 Whart. Ev. § 648. See, also, 2 Conk. Adm. 338. However, on their examination, the master, mate, and carpenter each swore that the protest was correct, and it will be considered as a part of their testimony.

The report is made, pursuant to a statute, by a public officer acting under oath. The survey was made at the request of the consignees of the vessel, and the statute required the warden to keep a record of it, open to the inspection of persons interested in the same, and to furnish a certified copy thereof, under his "hand and seal," to any person requiring it. In my judgment this record, or a copy thereof, is *prima facie* evidence of the pertinent facts contained therein, for or against the parties of this suit. 1 Whart. Ev. §§ 640–643.

The paper introduced is under the hand and seal of the warden, and purports to be a triplicate original. It is neither the record, which the statute requires to be kept in a "book," nor a copy thereof. But the warden, who was called as a witness by the libelant, testified that it was in fact the report of his survey, and it was so accepted by the parties.

There is no conflict in the testimony as to the place and manner of stowing the iron and anvils. The bundles and bars are from eight to fourteen feet long. They were stowed "grating fashion" on the floor of the vessel, properly dunnaged, on either side of the mainmast. The anvils were stowed around the mast on either side of the kelson. On top of these were placed three tiers of earthenware crates, and over all eight or ten tiers of the salt in sacks. Between the mast and this cargo there was a mat and an inch board.

On taking out the cargo it was found that sea-water had gone down the mast in such quantity as to wash out or drain away several sacks of salt, leaving a hole around the mast and next to the deck two feet wide on either side. Going down, the damp and wet from this inflow spread out through the straw in the crates 12 feet on each side of the mast, and as far aft, but less forward; but the floor was dry. The straw in many of the crates, when discharged, was still wet or moist, and in some it was soaked and rotten. It also appears that in a blow off Cape Horn the vessel shipped considerable water, and that during the night of April 20, 1887, a rent was made by some means in the mast-coat, down which

the sea-water poured when the decks were flooded for a number of hours.

Undoubtedly this was the way the salt around the mast was filled with water and sluiced out into the crates below, where the brine thus formed gradually found its way along and through the straw and ware in the crates downward and outward to the iron and anvils, where it was arrested by its affinity for the metal and converted into dry rust.

The protest, evidently written up in high colors for effect on shore, is filled with florid accounts of almost continual high winds and rough seas, from the river La Plata to the Pacific ocean, during a period of six weeks, in which the vessel is represented as straining and laboring as if on the verge of shipwreck. The casualties, however, are not material, except the breaking of the mast-coat, which the claimant attributes to the straining of the vessel in the heavy seas and high winds. But this is absurd. An iron vessel does not strain or work as a wooden one may. If it did, the rivets which hold the plates together would soon be cut off and the vessel go to pieces or to the bottom. Neither did the rolling and laboring of the vessel cause the iron mainmast to spring or work so as to tear the coat. The mast is wedged tight in the timbers where it passes through between the decks, and has four inches play where it passes through the main deck. If the coat was broken by the working of the mast, it would most naturally be torn from its fastening on the mast or the deck, but the evidence is that it was not so torn, but the seam which runs up from the deck to the mast, and on the after side of the latter, was ripped, so that a hand could be thrust in the opening. How it took place does not appear, but it probably was caused by the water carrying something that got adrift against it, or it may be the direct result of a blow from a volume of water thrown on the deck by the shipping of a sea. However, this latter supposition is not very probable, unless the coat was rotten, to which effect there is some evidence. But, however this is, it may be admitted that the ripping of the coat, whatever caused it, was a peril of the sea, within the exception of the bill of lading. And then the question arises, did the misconduct or negligence of the carrier contribute to the injury resulting therefrom to the cargo; or, in other words, would the exercise of proper skill and diligence in the stowage of the cargo or the repair of the coat have prevented this injury, notwithstanding the accident?

From the evidence it appears that the break in the mast-coat occurred some time in the night. The mate says it was repaired next morning. The carpenter says:

"It was my place to go around in the morning and evening, and sound the ship. The mast-coat is near the pumps, and that is where I noticed it when I sounded the ship in the morning. The seam was between five and six inches on the aft part of the mast, and the hole was in the seam."

He adds that it was all right when he sounded the ship in the evening; and in the morning he discovered the break, and repaired it immediately by tacking a piece of lead over it.

During this period it appears that the deck was flooded with water, which may have been running down this hole for at least 12 hours.

This, in my judgment, **was** negligence. According to the evidence of the claimant, the breaking of the mast-coat may be expected under such circumstances; and particularly if the material is rotten or decayed, as this probably was. Under the circumstances, it should have been discovered before it was. But in the protest, which is signed and sworn to by these witnesses, and which they now swear is correct, it is stated:

"At 4 P. M. (April 20th) discovered seam of mainmast coat gone, caused by the heavy rolling and straining; a large quantity of water must have gone down into the hold."

And the master who made this protest, and thereby declared, what is apparent, that "a large quantity of water must have gone down into the hold" in this way, in his answer to the libel, as well as his deposition, gingerly admits that "some water was precipitated into the hold" by this means, but "is almost certain" that it did not reach the iron. The protest also states that on April 12th "sounded pumps, and found eight inches of water in the forward hold, and six and one-half in main hold;" while the carpenter in his deposition says: "We had no occasion to pump her, [the Nith.] She made no water. An inch or an inch and a half is what we have taken out of her."

But even admitting that the water going into the hold through this rent in the mast-coat is a peril of the sea that could not by ordinary skill and diligence have been prevented or remedied sooner than it was, still, in my judgment, the carrier is liable to the libelant for the injury thereby done to the iron, because it was improperly stowed. There are some things that one person of common sense and ordinary intelligence can understand and have an opinion about as well as another, be he ever so expert; and, in my judgment, one of them is that salt and iron, unless it may be pig, should not be stowed contiguous to one another, and particularly that the former should not be stowed over the latter, when there is any chance for water or drainage to come through or from the salt to the iron.

In Stevens on Stowage, an English work (1869) of admitted authority, it is said, (page 478, § 849:)

"Salt, from its moisture, should be divided by bulkheads from other goods; even crates should not come in contact, for the straw will rot, and breakage ensue. * * * The evaporation from salt, which settles against the under parts of the decks, will, when it falls, prove very injurious to some descriptions of perishable goods below,—iron and machinery especially."

But it is said that this was dry salt; and so, I suppose, is the salt of commerce generally. But, however dry it may be when shipped, it will absorb the moisture around it; and if any water falls on it from above, it will drain out below in the form of brine, and corrode and destroy whatever iron it comes in contact with.

Of course, the master says it was properly stowed. The mate avoids giving an opinion on the question, and says the iron was in the ship before the salt was offered, and the master had to take it. But the stevedores, who know more about the matter than the mate, speak of this salt as a part of the cargo while yet the iron was unstowed. And the

mate is mistaken as to the law. A carrier is not bound to take goods which are likely to injure goods already received for carriage. 2 Pars. Cont. 174.

But it is not likely that the master had anything to do with receiving or stowing the cargo. The owners put the Nith up for Portland, and the freight clerk received the freight as it came on the quay, and gave receipts for it, which were afterwards extended into formal bills of lading, and signed by the master as the agent of the owners; and in the mean time the cargo was stowed by the stevedores, who were especially employed by the owners for that purpose.

On the trial, the claimant produced six witnesses who testified as experts that the stowage was good. Three of them are British ship-masters temporarily in this port. One of them, the master of the Roscrana, undertook to emphasize his testimony on this point by saying that on his voyage out from Liverpool he had brought a cargo of salt and iron, in which the latter was stowed in the hold under the salt. But on being presented with his own bill of lading for 520 bundles and bars of Swedish iron, noted, "Stowed in 'tween-decks," he was taken back, and tried to get out of the dilemma by saying there was some pig iron stowed in the hold.

On the other hand, the libelants produced five witnesses who testified as experts that this iron was badly stowed, and that salt should never be stowed over iron, except pig, unless a tight deck or bulkhead is put between them, which will carry the drainage, if any, to the sides of the vessel. These witnesses are all persons of good standing in this community. They are not sea-tramps, here to-day and gone to-morrow, but men of substance and permanence, who are responsible for what they say. They are all seamen now living ashore. Four have served as masters for many years, and the other, who rose to the rank of first officer, is now engaged in the hardware business.

Their testimony, under the circumstances, far outweighs that of the claimants on this question. But, as I have said, it needs no expert testimony to show that this stowage was bad. The fact is apparent to any person of common sense and ordinary intelligence.

But the error of this stowage can be demonstrated on another ground, beyond cavil. Admitting, for the present, that the salt might have been safely stowed over this iron, as it was, still it should not have been stowed so near the mast. One of the most candid and considerate of the claimant's seafaring witnesses, C. C. Planch, admitted that in this particular the stowage was bad, and that the dunnage between the salt and the mast ought to have been at least four or five inches, instead of one or two; and in my judgment he might well have said one or two feet, and included the crates and iron as well as the salt. Had this been the case, the water that went down the rent in the mast-coat would have run off to the bottom of the vessel without touching the cargo. The fact that the mast-coat is liable to break in such weather as may be expected off the Horn in the passage to the west during the winter, is a circumstance which proper skill and diligence in stowing cargo will take

into consideration, and provide against. This was certainly not done in this case, when at least four or five feet of salt was stowed over crates and iron, within an inch or so of the mast. And so, when the peril came, and the water went down the mast in a stream of some inches in quantity, it necessarily came in contact with the salt, which carried it downward and outward, on either hand, in the form of pickle, to the straw in the crates, which naturally conducted it still further in the same direction, until, as I have said, it was arrested by its affinity for the iron, and converted into rust.

And this gives occasion to notice the argument or suggestions of some of the claimant's expert witnesses, that the presence of the salt added nothing to the peril, as the sea-water that went down the rent was sufficient to have rusted the iron anyway. But the difference between the corrosive power of simple sea-water, which contains only four ounces of salt to the gallon, and water drained through a bank of salt, and containing probably 33 per centum of the same, is something material. Besides, if the salt had not been there, the water would not have been diverted from a direct line, and at most would only have wetted the ends of the iron, and the injury would have been comparatively small. But, in my judgment, it was bad stowage to place either of the articles so near the mast, where they were liable to become wet, or even moist, from the passage of water down the same.

If the salt, crates, iron, and anvils had been dunnaged away from the mast one or two feet, the water that went through the rip in the mast-coat would have passed down to the bottom of the vessel without touching either of them; and the cargo would have reached its destination, so far as this peril is concerned, in good condition.

Admitting that the cargo was properly stowed in every other respect, it was faulty in this. It was the duty of the carrier to guard against this peril of the sea by leaving a sufficient space between the cargo and the mast to allow any leakage at this point to pass directly down the latter, without coming in contact with the former, into the bottom of the vessel, and within the suction of the pumps.

In *The Reeside*, 2 Sum. 571, Mr. Justice STORY says:

"Dangers of the seas, whether understood in its most limited sense, as importing only a loss by the natural accidents peculiar to that element, or whether understood in its more extended sense, as including inevitable accidents upon that element, must still, in either case, be clearly understood to include such losses as are of an extraordinary nature, or arise from some irresistible force or some overwhelming power, which cannot be guarded against by the ordinary exertions of human skill and prudence."

In *Richards v. Hansen*, 1 Fed. Rep. 61, Mr. Justice CLIFFORD, after citing this passage from the opinion in *The Reeside, supra*, says:

"Hence it is that if the loss occurs by a peril of the sea that might have been avoided by the exercise of any reasonable skill or diligence at the time when it occurred, it is not deemed to be, in the sense of the phrase, such a loss by the perils of the sea as will exempt the carrier from liability."

In this case there was a manifest failure to exercise such skill and diligence (1) in discovering and repairing the rent in the mast-coat, assuming that it was broken in the night, and not discovered or repaired, as stated in the protest, until 4 P. M. the next day; (2) in stowing the salt over the iron and anvils, as was done; and (3) in stowing the iron, crates, and salt, and particularly the latter, around the mast, without leaving sufficient space for any water that might come through the mast-coat to pass down without coming in contact with the cargo.

The only remaining question is that of damages. The measure of damages in this class of cases, where there has been a failure to deliver, is the current value of the goods at the port of destination, with interest on the same. Some of the authorities say that the allowance of interest should depend on circumstances. But I do not see why it should be disallowed in any case where the shipper is entitled to damages for non-delivery. From the date of such non-delivery the owner, by the fault of the carrier, is deprived of the use of the money or capital invested in the goods, and should have redress by being allowed legal interest thereon. The tendency of the modern authorities is to allow interest in all cases, and surely this is one in which it ought to be allowed, if in any.

The libelants are wholesalers and jobbers in iron, and sell to retailers and consumers in this market. The current price at this port, in their trade, of the iron and anvils, at the time delivery ought to have been made, is the measure of their damages; and that is the sum claimed in the libel,—$3,700.17. The Gold Hunter, Blatchf. & H. 308; 3 Suth. Dam. 217; Railway Co. v. Jurey, 111 U. S. 596, 4 Sup. Ct. Rep. 566; Fland. Mar. Law, 158, note 4; Watkinson v. Laughton, 8 Johns. 164; Bracket v. McNair, 14 Johns. 170; Sturgess v. Bissell, 46 N. Y. 464; Carv. Carr. by Sea, § 727; 2 Sedg. Dam. 355.

One year and ten days have elapsed since the arrival of the Nith in this port, and, allowing ten days for the delivery of the goods, the libelants are entitled to the legal rate of interest, 8 per centum, on the amount of the damages for one year,—$296.01.

A decree will be entered that the libelants recover the sum of $3,996.18, together with their costs and disbursements; and, unless the same is paid within 10 days from the date of the decree, execution may issue to collect the amount from the stipulators.