THE JEANNIE.

(District Court, W. D. Washington, N. D. June 25, 1915.)

No. 2570.

1. SHIPPING ☞132—DAMAGE TO CARGO—PRESUMPTION OF NEGLIGENCE.
Where goods were received by a ship in good condition and delivered in a damaged condition, and seaworthiness is shown, there is a presumption that the damage was due to negligence of the master and crew in caring for them.
[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 471–487; Dec. Dig. ☞132.]

2. SHIPPING ☞121—CARRIAGE OF GOODS—IMPLIED WARRANTY OF SEAWORTHINESS.
The implied warranty of seaworthiness of a ship at the commencement of a voyage, which accompanies every contract of affreightment, extends not only to hull and equipment, but also to proper stowage and the fitness of the ship, with reference to the season and waters to be navigated, to carry the cargo undertaken to be transported in safety and without injury.
[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 225, 449–451, 466; Dec. Dig. ☞121.]

3. Shipping ⬦⟶140—Contract of Affreightment—Bills of Lading.

Where a ship before sailing engaged orally to bring a cargo on her return voyage, she could not limit her liability by bills of lading delivered after loading to employés of the shipper having no authority to represent it.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 493–495; Dec. Dig. ⟶140.]

4. Shipping ⟶137—Liability for Injury to Cargo—Harter Act.

The Harter Act (Act Feb. 13, 1893, c. 105, 27 Stat. 445 (Comp. St. 1913, § 8029 et seq.) does not exempt a ship from liability for damage to cargo due to unseaworthiness at the commencement of the voyage, or to failure to exercise due diligence in loading, stowage, or care of the cargo.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 492; Dec. Dig. ⟶137.]

5. Shipping ⟶120—Liability for Damage to Cargo—Negligence in Caring for Cargo.

Respondent vessel, before leaving Seattle on a voyage to Alaskan ports, contracted to bring a cargo of salmon for libelant on her return voyage. The salmon was in cans, labeled for market and packed in cases. On the outward voyage the ship carried a cargo of coal. On the return voyage, by reason of the insufficiency of the tarpaulins over the hatches and the breaking loose of a plank in the hull, water entered the hold and the cargo was damaged by the water and coal dust. *Held*, that the damage was due to the negligence of the master and crew in failing to put the ship in fit condition for such cargo, and to exercise proper care to protect it from the coal dust and water, and that the ship was liable therefor.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 225, 226, 440–448, 466; Dec. Dig. ⟶120.]

6. Shipping ⟶131—Damage to Cargo—Measure of Damages.

The damage in such case having been to the cans and labels, which were reconditioned by libelant after delivery, it was entitled to recover as damages the cost of such reconditioning, with legal interest, and any depreciation in the market value of the salmon during the time necessarily taken therefor.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 467; Dec. Dig. ⟶131.]

In Admiralty. Suit by the Alaska Pacific Fisheries Company against the steamship Jeannie, Alaska Coast Company, claimant. Decree for libelant.

Libelant commenced an action against the steamship Jeannie, a wooden vessel of about 800 tons, and 22 years old, 12 to 14 years of which time she had been plying the Alaskan and north Pacific Coast waters, and chartered in the spring of 1912 by W. F. Swan and W. C. Dawson for trade between Seattle and Alaskan points, for loss sustained to a cargo of salmon shipped from various points in Alaska to the city of Seattle, for damage occasioned to the salmon on account of improper dunnage and unseaworthy condition of the vessel, by reason of which the hold of the vessel was flooded. It appears that in the early part of December, 1912, the Jeannie left Seattle with a cargo of 500 or 600 tons of coal and some merchandise for southern Alaskan ports. While north-bound she was detained for several hours, on December 12th or 13th, in Wrangell Narrows, off the southeastern coast of Alaska, where she was anchored in shallow water and sank into about four feet of mud, but floated again with the return of the tide, and proceeded to Juneau, where she arrived on or about the 15th of December. The coal was to be delivered at Juneau, Gypsum, Sulzer, Sitka, and Ketchikan. Owing to bad weather no stop was made at Gypsum or Sulzer. About 150 tons were delivered at Sitka, some at Juneau, and some at Ketchikan. After leaving Juneau the vessel

proceeded to Chilcoot where a portion of libelant's salmon was loaded. The Jeannie then attempted to go to Gypsum, but owing to bad weather was compelled to go on to Sitka without stopping at Gypsum. From Sitka the vessel tried to go to Sulzer, but was unable to stop there because of unusual weather, and proceeded to Ketchikan, where the balance of the coal was unloaded, and from there to Yes Bay and Chomley, where the balance of libelant's salmon was loaded, returning from there to Ketchikan, from which port she proceeded on her homeward voyage, January 3, 1913, and arrived in Seattle, January 8, 1913, after an unusually tempestuous voyage. The Jeannie received, on this trip, from libelant's canneries, 10,747 cases of canned salmon at Chilcoot, 13,972 cases at Yes Bay, and 4,737 cases at Chomley, aggregating 29,657 cases, for transportation to Seattle. The Jeannie had made frequent trips to and from Alaska. No survey or inspection of the vessel was made between the time of her arrival in Seattle on her last preceding voyage and her departure from Seattle on the voyage in question. Her master and pilot, as well as the charterers, testified that they believed she was in good condition. A preliminary survey of the Jeannie was made June 22, 1912, and a thorough survey made July 26, 1912, in dry dock. Certain repairs were recommended and made, and the vessel certified to be in a good seaworthy condition and fit to carry dry and perishable cargo. No further repairs were made until September following, when some caulking was done around the steam winches on the deck, and other minor repairs made. The tarpaulins were insufficient to prevent leakage. Some of the coal was discharged before salmon was taken on. After coal was taken out of the hold, the hold was scrubbed, scraped, rubbed, and made as clean as they thought it was necessary. There was no bulkhead between the salmon and the coal remaining on the vessel when the first salmon was taken on. A loose plank was discovered in the forward part of the ship, in the middle of the hatch in the clear space between the salmon and the coal, that had been lifted up by the force of the water and was lying to one side, which caused the water to wash the bilges and flood the salmon. The spikes in the plank had been driven into the knees or cross-beams of the ship which were not rotten, and the plank was again spiked to position and held. The plank was of soft wood, and the only way the witness accounted for the loosening of the plank was that the water "just hammered underneath it until it lifted it up." The space in which the bilge water could accumulate underneath the plank and the outside planking on the bottom of the ship was about nine inches, and the witness thought the water in that space, working from side to side, would have enough force to loosen the plank, although he had never seen it happen to any other ship he was on, and he thought the only way the water got in to damage the cargo was through the seams of the ship opened by the straining of the vessel in the heavy seas. On redirect examination he stated that the plank that was loosened was about 1½ feet from where the salmon was, and that it was apparently the same age, size, and construction as the other planks of the ship. Upon arrival at the port of Seattle, it was found that the entire cargo was damaged from coal dust and water. A special examination and survey of the cargo was made and notice of damage given to claimant, and with the knowledge and approval of the owners, and in order to reduce the loss to a minimum, libelant caused the salmon to be overhauled and reconditioned.

Two amended libels were filed in this case; the first to conform to the testimony, and the last in the nature of a reply in conformity to Admiralty Rule 51 (29 Sup. Ct. xliv).

C. H. Hanford and Kerr & McCord, all of Seattle, Wash., for libelant.

Bogle, Graves, Merritt & Bogle, of Seattle, Wash., for claimant.

NETERER, District Judge (after stating the facts as above). [1] Recovery in this case, if it is to be had, must be upon the unseaworthy condition of the vessel, improper dunnage, or negligence in caring for the cargo. It is contended by claimant that the ship was seaworthy,

and that if it was not actually seaworthy, it was operated with due diligence to make it so, and that it is exempted from liability by the stipulations of the bills of lading; that damage, if any, was due to the extraordinarily rough weather, bringing the damage within the excepted perils of the sea; that the damage, if any, caused by coal dust, was without fault or negligence on the part of the owners; and that if there is any liability, it is not nearly the amount claimed. I think the testimony in this case abundantly establishes the fact that the vessel was not in a seaworthy condition, especially in view of the presumptions of law which obtain in favor of libelant. The Patria (D. C.) 125 Fed. 425; Id., 132 Fed. 971, 68 C. C. A. 397; Wright v. Grace & Co. (D. C.) 203 Fed. 360. The fact that damage was occasioned by reason of water coming in contact with coal dust is conclusive, to my mind, that the proper diligence had not been exercised to place the hold of the ship in the condition that it should have been in to receive the salmon after the coal was taken out, or proper care taken in removing coal after some of the salmon had been loaded. Parties must exercise the diligence which the circumstances demand, and while it would not have been necessary to have taken greater precaution in cleaning the hold of the ship from the coal dust than the sweeping, brushing, and scrubbing which the testimony shows was done, or placing such covering over the salmon as shown, when taking coal out, to make the vessel fit to carry some cargoes, the officers of the ship must, at their peril, when they store a cargo of salmon which is labeled ready for the market, and which must be exposed for sale, and where the contact of water and coal dust would be destructive of the attractibility of the prepared eatables, exercise a greater degree of care than otherwise, and the fact that the complaint was made with relation to the tarpaulins as being inadequate and insufficient and the loosening of the keelson plank underneath the hold, and the fact that water did get into the hold of the ship in the quantities which the evidence shows, are all conclusive, to my mind, that, taking into consideration the character of the cargo, the parties did not exercise that degree of care which the circumstances demanded, and unless they are excused for some other reason, that liability attaches. I think, it being established that the salmon was in good condition when it was received, the legal presumption would be that any damage which was occasioned was occasioned through the negligence of the officers of the vessel. The Queen (D. C.) 78 Fed. 156, and The Rappahannock, 184 Fed. 291, 107 C. C. A. 74. Nor is the presumption of unseaworthiness the only presumption arising where goods are shown to have been received by a carrier in good condition and delivered in a damaged condition. Negligence is presumed on the part of the master and crew in caring for the goods which are damaged during the progress of the voyage. In the Queen, supra, 78 Fed. at pages 165, 166, the court said:

"In the present case, the claimant has introduced testimony to establish the seaworthy condition of the vessel when she set out on her voyage, and this testimony has not been contradicted. Now, if the only presumption of negligence arising out of the damaged condition of the merchandise was that the voyage had been commenced with a vessel in an unseaworthy condition, the court would be compelled to hold that the claimant had sufficiently answered

the prima facie case made out by the libelants; but this does not appear to be the full scope of the presumption of negligence attributable to the carrier under this aspect of the case. Underlying the contract is the implied warranty, on the part of the carrier, to use due care and skill in navigating the vessel and in carrying goods, and it may be that, through some carelessness or negligence on the part of the carrier during the voyage, goods laden on board the vessel may suffer damage."

[2] As to the seaworthiness of the vessel the claimant is an insurer, and can only escape liability for water damage by reason of perils of the sea; that is—

"those perils which are peculiar to the sea, and which are of an extraordinary nature, or arise from irresistible force or overwhelming power, and which cannot be guarded against by the ordinary exertions of human skill and prudence." The Giulia, 218 Fed. 744, —— C. C. A. ——.

While the evidence shows that the sea upon this voyage was tempestuous even for Alaskan waters, it was not such a condition as to bring it within this exception. As to the cargo, of course the same degree of diligence does not apply. A vessel, to be seaworthy, must be tight, staunch, strong, well furnished, manned, and vitualed, and in all respects equipped in the usual manner for the merchandise service in such trade. 3 Kent's Commentaries, 205; The Lillie Hamilton (D. C.) 18 Fed. 327. It must be fit and competent to carry the particular cargo which it engages to carry (The Caledonia, 157 U. S. 124, 15 Sup. Ct. 537, 39 L. Ed. 644; Work v. Leathers, 97 U. S. 379, 24 L. Ed. 1012), and able to resist all ordinary action of the sea in the particular zone or sea which it engages to sail (Dupont de Nemours v. Vance, 19 How. 162, 15 L. Ed. 584), and as said by Justice Gray in The Silvia, 171 U. S. 464, 19 Sup. Ct. 8, 43 L. Ed. 241:

"The test of seaworthiness is whether the vessel is reasonably fit to carry the cargo which she has undertaken to transport"

—and again, in The Southwark, 191 U. S. 9, 24 Sup. Ct. 3, 48 L. Ed. 65:

"As seaworthiness depends not only upon the vessel being staunch and fit to meet the perils of the sea, but upon its character in reference to the particular cargo to be transported, it follows that the vessel must be able to transport the cargo which it is held out as fit to carry or it is not seaworthy in that respect."

It could not be reasonably contended that a vessel engaging to sail the Alaskan waters and carrying canned salmon could do so in a vessel which was not able to ride the seas in these particular waters during the particular season of the year in which the voyage was made, unless within the excepted sea perils, which is not shown, nor that canned salmon, as was this, to be sold to some extent because of the attractive appearance it would make upon exposition, could be stored in a hold of a ship in which coal had been carried, without taking every precaution to remove the particles of coal dust that were lodged there, and likewise to fortify against the waters of the sea and coal dust coming in contact with the cargo. The Lizzie W. Virden (C. C.) 8 Fed. 624, and Id., 11 Fed. 903; The Hudson (D. C.) 122 Fed. 96; The Florida (D. C.) 69 Fed. 159; The Mississippi (D. C.) 113 Fed. 985; and Id., 120 Fed.

1020, 56 C. C. A. 525. The only evidence to rebut the presumptions is merely the statement of the master and some members of the crew and one of the charterers, in which they say that the vessel was in apparently good condition, and that precautions had been taken to take away the coal dust which they knew was lodged there. In Corsar v. Spreckels, 141 Fed. 260, at page 269, 72 C. C. A. 378, Circuit Judge Ross, said:

"Indeed, unless otherwise expressly stipulated, an implied warranty of seaworthiness of the ship at the time of commencing the voyage accompanies every contract of affreightment. The Caledonia, 157 U. S. 130 [15 Sup. Ct. 537, 39 L. Ed. 644]. And this includes, not only a ship seaworthy in hull and equipment, which conditions it is conceded the Musselcrag met, but also seaworthy in respect to the stowage of the cargo. The Edwin I. Morrison, 153 U. S. 211 [14 Sup. Ct. 823, 38 L. Ed. 689] (and other cases cited)."

[3] In that case a ship was held liable for damage to a cargo of cement, where the ship, though not unseaworthy as to hull and equipment, was held unseaworthy as to stowage of cargo. The tarpaulins or hatch covers were not sufficient to prevent leakage (The C. W. Elphicke, 122 Fed. 439, 58 C. C. A. 421), in view of the voyage and the season of the year; nor is the ship released by reason of the stipulations in the bills of lading. The testimony, I think, is conclusive that these bills of lading were not delivered to any of the officers of the libelant company. If they were issued, they were delivered to the watchmen at libelant's canneries, persons who were not connected with the libelant company in any official relation, and who were not in a capacity to negotiate with relation to the transportation. The record shows that there was an oral understanding between the parties with relation to the shipment of this cargo, and while no terms appear to have been detailed or specially understood, liability could not be limited except by mutual consent, and if the bills of lading were not issued to any authoritative persons and there was no understanding with relation to them, then the libelant could not be bound by their stipulations. Mr. Justice Grey, in The Caledonia (C. C.) 43 Fed. 681, where there was a preliminary agreement for transportation service and subsequently a bill of lading containing exemption clauses was signed and accepted by the libelant, and there was a loss in the market value of the cargo during the delay in reaching destination, said:

"When the parties have made such a contract, the shipowner cannot, without the shipper's consent, vary its terms by inserting new provisions in a bill of lading. * * * In the case at bar, the unseaworthiness of the vessel consisted in the unfitness of her shaft when she left port. * * * The exception of 'steam boilers and machinery, or defects therein,' inserted * * * in the midst of a long enumeration of various causes of damage, all the rest of which relate to matters happening after the beginning of the voyage, must, by elementary rules of construction, and according to the great weight of authority, be held to be equally limited in its scope, and not to affect the warranty of seaworthiness at the time of leaving port upon her voyage. * * * A common carrier, receiving goods for carriage, and by whose fault they are not delivered at the time and place at which they ought to have been delivered, but are delivered at the same place afterwards, and when their market value is less, is responsible to the owner of the goods for such difference in value. * * * The same general rule has been often recognized as applying to carriers by sea in this circuit as well as in the second circuit."

And the Supreme Court of the United States, in 157 U. S. 124, 15 Sup. Ct. 537, 39 L. Ed. 644, in affirmance said:

"In our opinion, the shipowner's undertaking is not merely that he will do and has done his best to make the ship fit, but that the ship is really fit to undergo the perils of the sea and other incidental risks to which she must be exposed in the course of the voyage; and, this being so, that undertaking is not discharged because the want of fitness is the result of latent defects."

In Pacific Coast Co. v. Yukon Independent Transportation Co. (this circuit) 155 Fed. 29, at page 37, 83 C. C. A. 625, the court said:

"But if, indeed, the parol testimony so admitted in evidence did have the effect to modify some of the provisions of the bills of lading, it was, under the circumstances disclosed in this case, admissible for that purpose, for the bills of lading were issued after the goods had been delivered on board the Senator, and after they had passed from the control of the shipper, and the vessel was about to go on her way. The burden was then upon the carrier to show that its agents directed attention to the terms of the bills of lading, and that the shipper assented to them. The Arctic Bird (D. C.) 109 Fed. 167; Bostwick v. B. & O. R. Co., 45 N. Y. 712; Strohn v. Detroit & M. Ry. Co., 21 Wis. 554 [94 Am. Dec. 564]; Mo. Pac. Ry. Co. v. Beeson, 30 Kan. 298, 2 Pac. 496; Mich. Cen. R. R. Co. v. Boyd, 91 Ill. 268."

In this case, not only were the bills of lading not delivered to, and their stipulations called to the attention of, any officer or authorized agent of libelant, but they were delivered to watchmen at the canneries, utter strangers to any responsible or authoritative head of libelant company.

[4] Respondent contends that it is exempted from liability because of the Harter Act, and that there is no evidence that the master and crew of the vessel did not use due diligence to make the vessel seaworthy. Under section 1 of the Harter Act (27 Stat. at L. 445) it is unlawful for any vessel transporting merchandise to insert in any bill of lading or shipping document any clause relieving it from liability—

"for loss or damage arising from negligence, fault, or failure in proper loading, stowage, custody, care, or proper delivery of any and all merchandise or property committed to its * * * charge."

By the terms of section 2 of this act the owners, or agents cannot insert in any bill of lading or shipping document, any clause lessening, weakening, or avoiding the obligations of the owners, to exercise due diligence to properly equip, man, provision, and outfit the vessel. Section 3 of this act exempts vessels from liability for loss or damage resulting from faults or errors in navigation or in the management of the vessel, or from losses arising from dangers of the sea or other navigable waters, acts of God, or public enemies, or inherent defect in the thing carried, etc., provided the owner shall have exercised due diligence to make the vessel in all respects seaworthy and properly manned, equipped, and supplied. This act, from the conclusion we have arrived at from the testimony, cannot avail anything to the respondent. The Supreme Court of the United States in The Carib Prince, 170 U. S. 655, at page 660, 18 Sup. Ct. 753, at page 755, 42 L. Ed. 1181, says:

"Now, it is patent that the foregoing provisions (section 2, Harter Act) deal not with the general duty of the owner to furnish a seaworthy ship, but solely with his power to exempt himself from so doing by contract, when the particu-

lar conditions exacted by the statute obtain. Because the owner may, when he has used due diligence to furnish a seaworthy ship, contract against the obligation of seaworthiness, it does not at all follow that when he has made no contract to so exempt himself he nevertheless is relieved from furnishing a seaworthy ship, and is subjected only to the duty of using due diligence. To make it unlawful to insert in a contract a provision exempting from seaworthiness where due diligence has not been used cannot, by any sound rule of construction, be treated as implying that where due diligence has been used, and there is no contract exempting the owner, his obligation to furnish a seaworthy vessel has ceased to exist. The fallacy of the construction relied on consists in assuming that because the statute has forbidden the shipowner from contracting against the duty to furnish a seaworthy ship unless he has been diligent, thereby the statute has declared that without contract no obligation to furnish a seaworthy ship obtains in the event due diligence has been used. And the same fallacy is involved in the contention that this construction is supported by the third section of the act."

It follows that, the bills of lading being inoperative, respondent must not only show that due diligence was exercised in furnishing a seaworthy vessel, but that it was in fact seaworthy. It is contended by the respondent that the coal dust damage, if any, was occasioned by an error in management or navigation, and within the protection of the third section of the Harter Act, and in support of this contention cites Corsar v. Spreckles, supra. An examination of the case, I do not think, supports the contention. Judge Ross (pages 262, 263, of 141 Fed., 72 C. C. A. 378) says:

"It will be thus seen that by virtue of the Harter Act the ship is still held, as theretofore, responsible for loss or damage arising from negligence, fault, or failure in the proper custody, care, or delivery of the cargo, and at the same time is exonerated from damage or loss resulting from faults or errors in navigation or in the management of the vessel, where due diligence has been exercised to properly man, equip, and supply it, and to make it in all respects seaworthy. It will not do to so construe these provisions as to make them nullify each other. On the contrary, they must be so read as to give effect to each, if possible. Undoubtedly a fault or error in the navigation or management of a vessel carrying cargo may, and often does, result in injury to the 'custody, care and delivery' of the cargo. * * * But, if the owner of the vessel has performed his duty by making the vessel in all respects seaworthy for the voyage it undertakes, it is plain that neither he nor the vessel can be held responsible from any merely incidental damage resulting to the cargo from a fault or error in its subsequent navigation or management, if section 3 of the act is to be given any force. * * * In the case in hand, the record shows that for about seven weeks the ship in question struggled with wind and wave in an effort to round Cape Horn. * * * The question confronting him (the master) was primarily and essentially one of navigation—how best, in view of the trying circumstances in which he was placed, to deal with the elements and get his ship, with her crew and cargo, to the place of destination. That his action in determining that question was primarily and essentially one of navigation does not, in our opinion, admit of the slightest doubt; and, being such, neither the ship nor her owner is responsible for incidental damage sustained by the cargo, because of the provision of the third section of the act of Congress above referred to."

In that case the question was one of navigation and clearly within the third section of the act. In this case the damage was occasioned by the water and coal dust, by reason of the ship's officers' failure to properly prepare the hold and in handling or caring for the cargo, and not because of any error in management or navigation. In The Jean Bart (D. C.) 197 Fed. 1002, at page 1005, the court said:

"The question therefore is whether the failure to properly use the ventilating equipment is a fault or error 'in navigation or in the management of the ship,' under the third section; or whether it is 'negligence, fault, or failure in proper * * * care of * * * merchandise or property committed' to the charge of the claimant. It sometimes happens that the duty of the ship's officers may relate both to the management of the ship and to the care of the cargo, and the rule has therefore become established that the proper classification in law of such a duty depends upon the purpose to which it primarily relates. * * * I am of the opinion that here the failure of the officers primarily related to the care of the cargo, and only incidentally, if at all, to navigation or the management of the ship."

[5] The master and crew, I do not think, used due care in protecting the cargo from the coal dust and water, and respondent cannot find refuge within the provisions of section 3 of the Harter Act.

[6] Finally it is contended that should a liability exist against the ship for any damage to the cargo, the full charge for reconditioning the salmon should not be allowed, and that no damage should be allowed for the difference in the market value of the salmon as claimed, for the reason that the libelant at all times had sufficient salmon in stock to supply all of the orders received during the delay in the delivery, and quotes the following from Moore on Carriers (2d Ed.) p. 623:

"Only actual damages, established by proof of facts from which they may be rationally inferred with reasonable certainty, are recoverable"

—and on page 624:

"Compensation for the actual loss sustained is the fundamental principle upon which our law bases the allowance of damages."

No issue can be taken to that as the basic principle underlying the law of damages, generally speaking. The testimony discloses that the charge made for reconditioning the salmon was a reasonable and ordinary charge; that the work done was necessary to place the salmon in as good condition as that in which it was received by the steamship Jeannie. The claim was paid by the libelant. It is contended by respondent that the so-called "market price" of salmon was not the price it could be sold for, but an arbitrary price at which the owners and dealers of salmon were willing to sell, and that the price was fixed by the Alaska Packers' Association, the largest producer of canned salmon on the coast, arbitrarily, irrespective of supply and demand, and this quotation adopted by the other packers, and the subsequent reduction of price was fixed in the same arbitrary manner and that Kelley-Clarke Company handled practically all of the salmon sold in the Seattle market, and all of libelant's pack for that year, and that when it received orders for salmon it apportioned the orders among its various members, taking into consideration kind, quantity, brands, etc., and that during this period of delay there were few orders for salmon at prices they were willing to accept, and that they had quantities of salmon of all brands belonging to libelant with which orders could be filled. This contention, I do not think, can be sustained by the evidence. There is no testimony upon which the court would be justified in basing a conclusion of market value other than that contended for by the libelant. While there is some evidence upon which to base argument that the market price was merely

an arbitrary price, bearing no relation to supply and demand, I think that a fair consideration of all of the testimony, bearing in mind the relation to the issue, does not justify the court in adopting this as a conclusion. The market value is the price at which a commodity can be purchased in the open market, and there is no testimony of any other market value than that contended for. The measure of damages is stated by Moore on Carriers, at page 410, as follows:

"In an action against a carrier of goods for failure to deliver the same within a reasonable time, the measure of damages is the difference in value of the merchandise at the time and place it ought to have been delivered in the usual course of transportation and at the time of its actual delivery or tender, whether the difference in value was occasioned by injury to the goods or was due to a decline in the market value, with interest added, and freight charges, if any unpaid, deducted."

It was the duty of the parties to this litigation, upon discovery of damage, to lessen, if possible, the damage, and having chosen to recondition the salmon and thus diminish the claim, libelant is entitled to recover the cost and charges of reconditioning, as well as the depreciation of the market price of the salmon during the reconditioning period, the delay in marketing being directly caused by the carrier. The law presumes a loss equal to the depreciation in market value during the period of detention, and from the evidence, taking the market price as disclosed by the record as a basis which must be adopted by the court, we find a loss in depreciation of $7,935. The cost or value of reconditioning is $4,283.06. I think that interest should be allowed at the legal rate upon the moneys expended by the libelant in reconditioning the salmon. Judge Deady, in The Nith (D. C.) 36 Fed. 96 (Dist. Court Ore.), said:

"Some of the authorities say that the allowance of interest should depend on circumstances. But I do not see why it should be disallowed in any case where the shipper is entitled to damages for nondelivery. From the date of such nondelivery the owner, by the fault of the carrier, is deprived of the use of the money or capital invested in the goods, and should have redress by being allowed legal interest thereon."

The decision of the District Court in that case was affirmed in (C. C.) 36 Fed. 383. From this expression, approved by the Circuit Court of this circuit, having found that libelant is entitled to recover, I think that it must also recover interest at the legal rate covering the period of detention.

The shipper having a right to resort to the vessel for damages growing out of failure to fulfill the contract for the carrying of merchandise, by the maritime law, The Belfast, 7 Wall. 642, 19 L. Ed. 266, and Dupont de Nemours v. Vance, supra, a decree may be presented in accordance with this opinion.