THE SEVEN BELLS.

(Circuit Court of Appeals, Ninth Circuit. February 5, 1917.)

No. 2760.

1. SHIPPING ⊂⊃104—CARRIAGE OF GOODS—CONTRACT BETWEEN TOWBOAT AND BARGE.

The owner of a barge without motive power made a contract with the owner of a gasoline launch for six months, with privilege of renewal, by which, for a stated sum per month, the launch was to make daily trips with the barge between two ports on San Francisco Bay, to "haul all freight and express," and her owner was to furnish "towboat and men to handle cargo." *Held*, that such contract was not merely one for towage, but for carriage, under which the two vessels became one instrumentality; the owner of the barge becoming owner of the launch pro hac vice, and the liability of the one instrumentality that of carrier.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 225, 404–410.]

2. SHIPPING ⊂⊃121(1)—LIABILITY FOR LOSS OF CARGO—UNSEAWORTHINESS OF VESSELS.

A barge, towed by a gasoline launch, used as a single vessel in transporting goods between ports in San Francisco Bay, *held*, on the evidence, insufficient for the service undertaken, in that the launch was not of sufficient power to properly handle the barge in rough weather, such as was ordinarily to be expected in winter; and both vessels *held* liable for loss of the cargo of the barge when she was cast off by the launch during a high, but not extraordinary, wind and drifted ashore.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 225, 449, 466.]

Appeal from the District Court of the United States for the First Division of the Northern District of California; M. T. Dooling, Judge.

Suit in admiralty by V. J. B. Cheda against the Halvorsen Transportation Company, J. B. Arkison, H. C. Halvorsen, George W. Dornin, C. R. Codding, G. C. Codding, P. S. Colby, and A. M. De Vall, a certain

---

⊂⊃For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

barge, and the gasoline launch Seven Bells. Decree for libelant, and respondents appeal. Affirmed.

The amended libel in this case alleged, among other things, that at the times therein mentioned the Halvorsen Transportation Company was a corporation and common carrier of freight between the cities of San Francisco and San Rafael in the state of California, and that the personal defendants were stockholders in the corporation and collectively owned all of the subscribed capital stock; that on or about December 31, 1913, the transportation company mentioned received· at San Francisco from the libelant and from various other named parties certain goods and merchandise specifically described in the libel, the value of which is also alleged therein, for transportation by water from San Francisco to San Rafael; that all of the said property was put by the carrier in a barge, which, having no motive power of its own, the carrier employed the respondent gasoline launch Seven Bells as a towboat to tow the barge; that at the times mentioned in the libel as amended "the said barge was unfitted to carry said goods, in this: that it had an anchor, but no anchor chain, and but one man on board, when it should have had [at] least two, and after the loading of said goods on said barge the said launch Seven Bells undertook to tow the said barge with said goods so on board from said San Francisco to said San Rafael, that at said time the weather was bad and stormy and unfit weather to make said voyage, and the said gasoline launch was not of sufficient capacity or power to tow said barge at any time, but the master of said launch, well knowing that fact, took the said barge in tow so laden and proceeded on said voyage, that upon arriving near said San Rafael the master of said launch negligently and carelessly and without any ,cause therefor cast off a towline with which said launch was towing the said barge, so that said launch could no longer tow the same, and allowed the said barge with the said goods on board to drift with the wind and tide, and said barge, having no anchor chain, was unable to anchor, but drifted ashore by reason of the wind and sea, which were heavy and stormy, to wit, both the wind and the sea, where the said barge was so cast adrift were heavy and stormy, and the whole·of the hereinbefore mentioned goods by reason of the foregoing became lost, and none thereof were delivered to any of the hereinbefore mentioned persons to whom the same belonged, excepting that some of the wheat belonging to Cheda & Co. was delivered to it, damaged and of no ascertainable value"; that prior to the filing of the libel all of the other shippers of goods therein mentioned "assigned and set over their and each of their claim and demand for the loss of said goods so belonging to them and lost as aforesaid to libelant, and libelant is now the owner and· holder of such claims and each thereof and all rights thereunder." The prayer was for a decree for the amount of the losses alleged to have been sustained, and for the condemnation and sale of both the barge and launch.

The answer of the transportation company admitted its receipt of the merchandise and its agreement to carry it as alleged, but in that connection alleged that the launch Seven Bells was employed by it to tow the barge on daily trips to and from the ports of San Francisco and San Rafael, and "that the said Seven Bells was in charge of her own master and had the exclusive control, direction, and management of both the said Seven Bells and said barge, and that the said barge was manned by a crew selected and appointed by the owners of the said Seven Bells." The answer of the company further alleged that by the bills of lading under which the merchandise was shipped the same was to be delivered "in like good order and condition at the port of San Rafael as when received, except that, if due diligence had been used to make the said vessel in all respects seaworthy and properly manned, equipped, and supplied, the carrier should not be liable for any loss or damage that should result in whole or in part from the perils of the sea, or other waters, stranding or other accidents of navigation, fault or error in navigation of vessel, fault or error in management of vessel, whether such fault or error was before or after sailing, or was in port or at sea." The answer mentioned further alleged that the loss and damage referred to in the libel were caused solely by the perils of the sea, which, "notwithstanding

that due diligence had been exercised to make the said vessel in all respects seaworthy and properly manned, equipped, and supplied, caused the said barge to drag her anchor, which was immediately dropped and all of the anchor line paid out, when the said barge was so cast adrift by the said Seven Bells, but, owing to the violence of the wind and waves, the said barge was driven on to the shore by the wind and sea and it became wrecked, and the goods aboard said barge, by reason thereof, were damaged." This answer also put in issue the averments of the libel in respect to the insufficiency of the equipment of the barge and the lack of sufficient power of the launch, and, on the contrary, alleged the proper equipment of both and the proper power of the launch. Its answer also set up that the bills of lading only required the company to exercise due diligence to make the vessel seaworthy in all respects at the time of shipment and commencement of the voyage, which diligence should be presumed, and that the burden of proving negligence was on the shipper. It also set up in defense the provisions of the act of Congress of February 13, 1893, commonly known as the Harter Act (27 Stat. 445, c. 105 [Comp. St. 1913, §§ 8029–8035]).

The answer of the claimants of the launch Seven Bells admitted its employment by the transportation company to tow the barge having on board the goods described in the amended libel, and that it undertook to do so, but denied that the weather was then unfit to make the voyage in and denied that the launch was not of sufficient power or was insufficiently equipped, and while admitting that upon arriving near San Rafael the master of the launch cast off the tow line with which it was towing the barge, alleged in effect that it was necessary to do so by reason of a heavy storm that came up, rendering it impossible for the launch to continue the towing and impossible to anchor the barge, and that the loss and damage to which the barge and its contents were subjected were caused solely by the act of God and the perils of the sea, and without any negligence either on the part of the launch or the barge.

The trial resulted in a decree against the respondents and in favor of the libelant for the amount of the loss and damage suffered by him and his assignors, from which decree the respondents appealed.

O. K. Grau and Ira S. Lillick, both of San Francisco, Cal. (Hill & Sealby, of San Francisco, Cal., of counsel), for appellants Halvorsen Transp. Co. and others.

Louis T. Hengstler, I. F. Chapman, and Golden W. Bell, all of San Francisco, Cal., for appellants claimants of Seven Bells.

H. W. Hutton, of San Francisco, Cal., for appellee.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

ROSS, Circuit Judge (after stating the facts as above). [1] In this case the carrier furnished a barge without motive power, which power was supplied under a written contract between the owners of the Seven Bells, extending for six months with the privilege of renewal, by the express terms of which they were to "haul all freight and express" for the transportation company for a stated sum to be paid each month, and to furnish "towboat and men to handle cargo to the extent of three men [and] also fuel for the run." That was not, in our opinion, a mere contract of towage, but one of carriage, and under it we think the launch and the barge became one instrumentality in the voyage; the owner of the barge becoming owner of the launch pro hac vice, and the liability of the one instrumentality that of carrier. The Columbia, 73 Fed. 226, 19 C. C. A. 436, and cases there cited.

[2] The record shows that one Gilmore was captain of the launch, was in charge of the operations in question, and made two starts on the

voyage—the first about 7 o'clock of the evening of December 30, 1913, from the San Francisco seawall, at a time when a storm was prevailing. After proceeding almost as far as Alcatraz Island, the captain concluded it best to put back to the seawall, and did so. The next morning at about 8 o'clock he again left the seawall at San Francisco, and reached a point between California City Point and San Quentin Point, when, according to some of the testimony, a squall of unusual violence and duration arose—one of the witnesses saying it was the severest wind he had ever experienced on the bay. We find it difficult, however, to reconcile that statement with the records of the weather bureau. We extract from the testimony of the assistant observer, as follows:

"Q. Have you the record showing the condition of the weather in San Francisco—that is, the records of the United States Weather Bureau—for December 30 and 31, 1913? A. I have. Q. Will you please turn to them and tell us what the condition of the weather was, with reference to wind, commencing, say, at 3 o'clock in the afternoon of December 30, 1913, down to 3 o'clock the next day? A. Do you want the maximum velocity? Q. Yes. A. It blew 40 miles an hour between 3 and 4. Q. What hour was that? A. At 3:35 p. m.

"Mr. Lillick: Q. What day was that? A. December 30th. Thirty-seven miles an hour at 4:53 p. m.; 36 at 5:50; 38 at 6:55; 42 at 7:12; 37 at 8:15; 38 at 9:26; 40 at 10:40; and 37 at 11:05.

"Mr. Hutton: Q. And coming down to December 31, 1913? A. We only record the maximum velocities when they exceed 36 miles. There were none on the next day, except it blew 40 miles an hour at 1:30 p. m. That was the only time it exceeded that; that was the only time it exceeded 36 miles an hour. Q. What were the conditions at 1 o'clock in the afternoon? A. The wind was high. The total number of miles in the different hours from 12 to 1 a. m. was 24, 1 to 2; 28, 2 to 3; and 30, 3 to 4.

"The Court: Q. Is that in the morning? A. Yes; 3 to 4, 21; 4 to 5, 21; 5 to 6, 19; 6 to 7, 18; 7 to 8, 22; 8 to 9, 21; 9 to 10, 23; 10 to 11, 26; 11 to 12, 25; 12 to 1, 33; 1 to 2, 34; 2 to 3, 27; 3 to 4, 17.

"Mr. Hutton: That is enough. Are those storm winds or otherwise? A. We call them storm winds when the velocity exceeds 36 miles an hour. Q. Those that you have given us for the 31st, are those average winds? A. That is the total number of miles that the wind blew during those hours. Q. That is the average for the hour, then. Is that the average for the hour? So that at some times during those hours the wind was higher than at others? A. Oh, yes; they were. Q. There is nothing to show what the maximum was during those hours? A. Except during one hour between 1 and 2—between 1 and 2, at 1:30 p. m., it blew 40 miles an hour.

"The Court: Q. But your record shows the average was 34? A. Yes; that was the total number of miles.

"Mr. Hutton: Q. State whether the storm signals were displayed in San Francisco during the whole of that time. A. They were; they were put up at 7:30 a. m. on the 30th. Q. When were they taken down, in San Francisco? A. 7 a. m. on January 1st. Q. They were displayed continuously, then, during that time? A. Yes."

Surely there is nothing in that record indicating that there was any unusual storm on the bay during the time in question. Nevertheless, the undisputed evidence is that the Seven Bells was unable to handle the barge when shallow water was reached and was obliged to let her go, resulting in the loss and damage for which the libel was filed. We think there was abundant evidence to justify the conclusion of the trial judge that the launch was not "sufficient to handle the barge on the flats in rough weather, and that therefore the combination of barge and

launch were not sufficient for the business in which they were engaged for weather ordinarily to be expected in winter." Not only so, but the transportation company's San Rafael agent, one O'Brien, testified that Gilmore had frequently told him that the barge was too heavy for the Seven Bells to properly handle, who so told him almost every time he came in to San Rafael, and that "many a time he would leave the barge up there and go back with the towboat." On cross-examination that witness was questioned and answered, among other things, as follows:

"Q. You were with the Halvorsen Transportation Company, were you not, in July of 1913? A. July of 1913? Q. Prior to the time this accident occurred? A. Yes; I guess I was. I have been with them from the time that they took the business. Q. You knew during all of that time that the Seven Bells did tow this barge back and forth between San Francisco and San Rafael? A. Yes. Q. And you knew that Mr. Gilmore was operating the Seven Bells? A. Yes. Q. Now, this conversation you had with Mr. Gilmore, Mr. O'Brien, was not that with reference to navigating the barge in San Rafael creek? A. No, sir. Q. You are sure of that? A. Yes. Q. When did that conversation take place? A. That conversation took place pretty near every time he came in. It was not one conversation, but it continued during that time he was around there. Q. What was the substance of that conversation? A. Well, the barge was too big for him to handle with the house on it. Q. Did you ever have any accident prior to this time? A. Not on account of the towing. It was too hard towing for the boat. Q. You had never had any trouble prior to this accident? A. No, sir; of course we were late many times, but not any such troubles as that. Q. Well, now, when was the first conversation you had to that effect, with Mr. Gilmore? A. Well, that I can't tell you. Q. Was it a month or two before this accident happened? A. Oh, no. It was a conversation from the time he started in to run. He seen that it was too heavy for him to handle."

O'Brien also testified that Gilmore was inexperienced and incompetent for the position he occupied, and when asked by the trial court whether he ever reported to the transportation company that Gilmore was in his judgment inexperienced, he answered:

"A. They knew it; they were going to make a change; they were figuring on some one to take his place; but they were never able to get any one to take his place."

His examination proceeded:

"Mr. Lillick: Q. Have you had any trouble with the Gilmores, any personal trouble? A. No, sir. Q. You have no feeling against them at all? A. No feeling toward them, as far as I know. Q. Who of the Halvorsen Transportation Company did you say anything to about Mr. Gilmore's competency? A. Well, they knew it themselves. He was fighting with them all the time. Q. You never talked to them about it? A. Well, Mr. Codding said he was going to make a change just as soon as he could get somebody to take his place. Q. It is only your conclusion as to what you think Mr. Codding knew of Gilmore's competency? A. It is no conclusion. They knew it. Q. How do you know they knew it? A. Well, I have talked to George Codding about it. Q. What did you say to him about it? * * * A. He said he would make a change just as soon as he could get somebody to take his place, but he didn't want him to leave him in a hole. He did not want to say much to him, because he was afraid Gilmore would quit and leave him in a hole."

The foregoing testimony of O'Brien is not without contradiction in the record, but it finds some confirmation in this extract from the testimony of Mr. Codding, who was the secretary of the company:

"Q. You heard the testimony of Mr. O'Brien here about the conversation he said he had with you regarding the competency of the Gilmores—you heard Mr. O'Brien's testimony in that particular? A. Yes. Q. Do you know anything about Mr. Gilmore with regard to his competency in the handling of a boat? A. I visited San Rafael occasionally, and had a conversation with Mr. O'Brien in regard to the Gilmores, and Mr. O'Brien complained of the manner in which the captain of the boat was handling the business. His main objection was the manner in which he attended to loading and unloading; that he would not follow Mr. O'Brien's directions. He made a great many objections to us on the conduct of the affairs of the company at that end. Q. Did you hear anything at all about Capt. Gilmore's competency as a navigator? A. I do not recollect that question came up at all. I am satisfied—I never questioned his competency as a navigator, or heard it questioned. Q. You never heard his competency as a navigator questioned? A. Not as a navigator; no, sir. Q. The objections that came from Mr. O'Brien were objections as to what was done about loading and unloading the barges? A. Yes; unloading and loading them. He was the superintendent there, and the men were somewhat insubordinate, did not always follow his directions, and he thought they ought to; in other words, he thought we did not get as good service as we might. Q. Did you ever hear anything about the barge being too big a barge for the launch that had been provided by the Gilmores to tow it? A. I do not remember positively of any conversation in regard to it. We would have preferred to have a stronger tugboat at times of very severe winds, but it was very difficult and impossible to get any boat to do better than that, because the draft there, or the channel, is very shallow, and you could not use the Golden Eagle in San Rafael creek. That was the best boat we could use. We concluded right along he had the best tow available for that purpose."

The trial court made no finding in respect to the competency of the captain of the launch, and reached its conclusion also "independent of the question as to whether or no the launch should have left the San Francisco side on the morning in question for any other reason."

Agreeing with the court below with respect to the insufficiency of the launch to handle the barge under conditions reasonably to be expected, we affirm the judgment.

The judgment is affirmed.