**In re O'DONNELL et al.**

**Ex parte SPENCER KELLOGG & SONS, Inc.**

Circuit Court of Appeals, Second Circuit.
July 15, 1929.

No. 288.

926

George V. A. McCloskey, of New York City (John H. Purdy, of New York City, on the brief), for tug.

Forrest E. Single, of New York City, for cargo.

Before MANTON, L. HAND, and SWAN, Circuit Judges.

L. HAND, Circuit Judge (after stating the facts as above). Regulation 3 of the superintendent of public works speaks of barges which are steered by a rudder and have a wheel or tiller. Only in such a case does it presuppose a wheelsman for each boat, who shall be always on duty. These barges were not steered in that way, but by two lines, one of which could be shortened to put a bend in a section, and so change its direction. No question is made of the propriety of this mode of navigation; there was no pretense that a man should be at each wheel, or that each barge should have a tiller, wheel, or rudder. We do not think that the regulation applied. Regulation 4 was general, and required "every" barge to be manned by having at least one man "for each boat," unless some dispensation was obtained, of which there was no evidence. The commissioner appears to have thought that this regulation was satisfied if at Buffalo there were five competent bargees on the fleet as a whole, for he entirely relied upon the custom to have a "tripper" for any default in manning when the voyage began.

Moreover, several of the witnesses impliedly took this view at the hearing. Nevertheless we do not think that the regulation means that. It says that "every" barge shall be manned, in the sense that there shall be a bargee "for each boat." This must mean, at least when the boats are singled out, that there shall be a bargee on each barge. It cannot be, when the fleet is under way and the sections separated by 200 feet of hawser, that it is enough if there are two men on one barge in the forward section and no competent man, or none at all, on one in the second. Obviously that would not be safe navigation. Now it is true that when the fleet left Buffalo, and for the 13 miles to Tonawanda, the barges were all clustered together in two tiers. It is possible that up to that point it was not improper to have some of the barges without any one on board, if the crew had not yet been assigned to the barges, though we doubt that the regulation allows

even that. If it does, perhaps a failure properly to distribute an as yet undistributed crew at Tonawanda would be only a fault in management or navigation. The Silvia, 171 U. S. 462, 19 S. Ct. 7, 43 L. Ed. 241. But these were not the facts. The "fleet captain," Dolland, though a bargee, had no intention of acting as such on the last or any other barge, except in an emergency, as between Lockport and lock 16. He was in general charge, and had detailed the unfit bargee and the boy together to take care of the last barge, where they were already stationed. That was their assignment when the voyage began; they were to continue to act as bargees of that boat when the fleet was singled out, and Dolland was to keep his roving command, going here and there, or nowhere, as occasion required. The purpose was then fixed; it was not the case of an undistributed crew to be later distributed. If, therefore, they were both incompetent, the barge owners had failed to fulfill that condition on which the privilege granted by section 3 of the Harter Act (46 USCA § 192) depended, and the tug, which must identify herself pro tanto with the barges to invoke the statute at all, is responsible for her own faults of navigation.

■ She makes only the faintest assertion that the bargee discharged at Lockport was fit; he clearly was not. He was drunk when he shipped, and failed to steer when he became sober. As to the boy, the evidence was in great dispute; but we will not disturb the finding of the commissioner, who had far better means of judging than we. He was certainly not over 19, probably less, and there was ample evidence to justify the conclusion that he was not able to man a barge alone. Indeed, he was never left alone until perhaps after lock 15, when the fleet was shorthanded. Therefore we conclude that the last boat was ill-manned on leaving Buffalo, regardless of the supposed custom to have a "tripper," on the existence of which we do not pass.

What took place at lock 15 is not relevant, unless we are to say that the voyage began anew at that place, since, as we have said, it is its commencement which counts. Supposing that we were to assume that it did, the fleet was again ill-manned. Either there was no man on one of the barges in the first section, or the boy was alone on the last barge; it makes no difference which.

There remains only the question whether the barge owners exercised due diligence to man the last barge at Buffalo. Plainly they did not. The qualifications of the boy could have been learned without difficulty, if not already known. The issue of due diligence is quite different from the right of the tug to limit liability. The right to take advantage of the Harter Act depended upon the diligence of the fleet as a whole in respect of both tug and barges; as to this the tug shared any default of the barge owners. The right of the tug to limit can hardly arise, as the decree states the face of all the claims to be less than $40,000, and the tug has given a stipulation for $44,000. At any rate, that question must await the liquidation of the claims.

The commissioner's fees are fixed at $500. Exceptions overruled, decree dismissing the claim reversed and cause remanded, with instructions to adjudicate the validity and amount of the claim.