## THE ANASTASIA.

### In re SOUTHERN TRANSP. CO.
No. 5826.

District Court, E. D. Virginia,
Norfolk Division.

March 14, 1935.

Leon T. Seawell, of Norfolk, Va., for appellant.

Thomas H. Middleton, of New York City, and Michael B. Wagenheim, of Norfolk, Va., for appellee.

WAY, District Judge.

In this proceeding, petitioner, Southern Transportation Company, which company is engaged in the ownership and operation of tugs and barges in the coastwise trade, has filed its petition for limitation of or exoneration from liability. The material facts disclosed by the testimony are:

About 2:30 in the afternoon of January 23, 1933, petitioner's tug Menominee sailed from Norfolk on a voyage to New York with the barges Anastasia, Ontario, and Charleston in tow. The Anastasia was the head barge, the Ontario second, and the Charleston last in the tow. The tug Menominee is a shipping board built vessel, having been constructed about 1919, is of approximately 441 gross tons, and appears to have been in seaworthy condition when she sailed on the voyage in question.

The Anastasia, the head barge in the tow, the loss of which is the subject of this controversy, was 228.1 feet long, 37 feet beam, and 19.3 feet depth, with 9 hatches and a carrying capacity of about 2,200 tons. That vessel was built for the shipping board in 1919 and appears to have been acquired by petitioner in December of the same year. The Anastasia was originally constructed as a three-masted schooner barge, but the masts were removed by petitioner. As a schooner barge, she was required to carry a crew of 5. After the removal of the masts, a crew of

only 3 was required. The Anastasia was fastened to the tug by a 11-inch hawser 225 fathoms in length; the Ontario to the Anastasia by a smaller hawser 200 fathoms long; and the Charleston to the Ontario by a similar hawser.

The Ontario, a smaller vessel than was the Anastasia, has a carrying capacity of 900 to 950 tons, and on the voyage in question was laden with a cargo of 600 or 700 tons of box shooks. The Charleston is still smaller with a carrying capacity of approximately 850 tons, and was laden with about 600 tons of tobacco stems. The Menominee was in charge of Capt. G. H. Powers, an experienced seaman, and a competent crew. The Anastasia was in charge of Capt. Roland, a competent master, and two seamen.

Weather conditions at the time of departure appeared to be favorable for the voyage. No change of consequence in the weather. was experienced until the tow passed Barnegat Light ship, which occurred about 12:40 p. m. on the 25th. In that vicinity rough weather was unexpectedly encountered, which later developed into a severe storm. The Menominee had a radio receiving set aboard and received frequent reports of the weather, and up to about noon of the 25th the reports were favorable.

The wind was from the east and shortly after noon of the 25th began to freshen up. By 2 or 2:30 o'clock the velocity had increased to such an extent that the master of the tug considered it necessary to turn from his course to New York, head directly into the wind, and slow down to avoid the effect of a beam sea on the Anastasia. Before he thus altered his course, the Anastasia, according to his testimony, was washing badly with a *"beam sea going clear over the barge and apparently endangering the hatch covers."* The master of the tug fixes that time as 3:10 p. m., but Capt. Kelly of the Ontario, petitioner's witness, testified that he awoke about 2:30 p. m. and on inquiry from the wheelhouse of the Ontario was informed *that the vessel had been headed due east ever since 2 o'clock.* According to the testimony of the master of the tug, the Anastasia had about 3 or 4 feet of freeboard at her beam, and 7 or 8 feet forward. The tug at first was slowed down to half-speed, and later as the wind increased, to just enough to hold the tow, the power of the tug serving as "a sort of sea anchor." The Menominee,

according to her master, had received no signals of distress from the Anastasia, or either of the other barges, other than what he had observed with respect to the washing of the decks of the Anastasia. At 6 p. m. on the 25th the tow was approximately 10 or 12 miles north of Barnegat Light Vessel, being about 75 miles north of Delaware Breakwater and 40 to 45 miles from New York (Brooklyn); that is, the tow at the time of heading into the wind and slowing down had traveled approximately two-thirds of the distance from Delaware Breakwater to New York, so that an attempt to turn back to Delaware Breakwater would have involved a much longer voyage than to New York and likewise have exposed the Anastasia to a beam sea. The velocity of the wind gradually increased all the afternoon and early night of the 25th, but did not reach what the Menominee's master considered gale force until about 8 or 9 o'clock that night. He estimated that by 8 or 9 o'clock its velocity had reached 40 to 45 miles an hour. About midnight of the 25th, a shift of the wind from south of east to north of east created a cross sea which made it more difficult for the tug to hold the barges headed into the sea. The master of the tug testified that at midnight he could still see barge lights at intervals although he was not able to determine on which barge they were, and that the "hawser and everything" (on the tug) were then in good condition.

Between 1:30 and 2 o'clock of the morning of the 26th, the Ontario broke loose from the Anastasia and to avoid danger of collision with the Charleston, was later cut loose from that barge and set adrift by her crew, leaving only the Anastasia fastened to the tug. During the early morning of the 26th, the wind reached a velocity of 55 to 65 miles, with occasional puffs which probably reached 70 miles an hour. From the time the wind reached its greatest velocity until daybreak of the 26th, observations made from the tug were very uncertain and throw no light on the fate of the barges. Capt. Kelly of the Ontario testified that when the Ontario broke loose from the Anastasia, which occurred between 1:30 and 2 a. m. on the 26th, he could still see the Anastasia's pilot house lights. Other testimony tends to corroborate him as to the visibility of her lights.

At daybreak the tug found that none of the barges was in sight. It was then as-

certained by the master that the hawser was leading out over the stern into the sea at an angle of about forty-five degrees, so that when the tug rose on the crest of a wave the hawser became very taught and snapped and cracked, and as the tug went down in the trough the hawser fell underneath the stern, endangering the tug's propeller. For that reason, the hawser was cut. The action of the hawser clearly indicated that the Anastasia had gone down during the night, but was still fastened to the tug at daybreak. No trace of the Anastasia or any of her crew has ever been found so far as the evidence discloses. At daybreak the Menominee had a slight list which continued to increase during the day. She remained in what was thought to be the general vicinity of where the Anastasia had gone down, until about 6 p. m. on the 26th. Due to the fact that she then had a decided list to port, her master considered it necessary to the vessel's safety to put into New York, where she arrived about 10 p. m. of the same day. Coal had gotten into the bilge pump line and suction wells as a result of her taking water, so that her bilges could no longer be pumped out.

Shortly after going adrift, the Ontario cast anchor, but about 5:45 a. m. on the 26th the anchor chain parted and for the second time she was adrift, in which condition she remained until about 12:30 of the morning of the 27th when she was rescued by the Coast Guard Vessel Sebasco, and towed into Delaware Breakwater. The evidence does not disclose that the Ontario suffered any very material damage as a result of her experience in the storm.

The Charleston, following the cutting of the hawser by which she was fastened to the Ontario, remained adrift until about 4:30 a. m., when she was anchored as a precaution against colliding with the Ontario then also adrift in the vicinity. The Charleston was rescued by the cutter Thestis and towed to Sandy Hook. She successfully rode out the storm, having suffered comparatively small damage. The captain described her condition with respect to water taken during the storm with the terse remark, "We had to run the pump right much."

In the course of the trial, claimant read the deposition of one Caleb Briggs, formerly employed on the Anastasia. He testi-fied to the effect that the Anastasia was unseaworthy in various respects. The credibility of this witness was seriously attacked by petitioner on the grounds of prejudice and bias against petitioner and further that he was in general unworthy of belief. Petitioner offered to show that Briggs had been arrested on numerous occasions for drunkenness, wife desertion, disorderly conduct, and testimony was given to the effect that petitioner had discharged him for inefficiency and drunkenness. In that situation the court requested claimant to arrange for Briggs to testify in open court in order to aid the court in passing on his credibility. Briggs was never produced. In view of this situation, the court, in reaching the conclusions herein announced, has felt constrained to disregard the Briggs deposition.

From about the first of June until some time in September, 1932, the Anastasia was tied up light in fresh water in the James river, to prevent the teredo from damaging her bottom. Whether during that period she made any voyage whatever does not appear. In September she was brought back to Norfolk or vicinity and between then and the time of the ill-fated voyage made one voyage to New London, Conn. It was asserted by petitioner during the trial that she made other voyages between September and January 18, 1933, but the nature and number of other voyages was not shown. Tying up a vessel light in fresh water in warm weather for any considerable period has a tendency to dry out the upper seams. It also appears that the Anastasia was last in dry dock for repairs about seventeen months prior to the voyage in question. It was the usual practice of petitioner to place its barges in dry dock for inspection and repairs once a year or thereabouts, and the practice was shown to be a salutary one.

The Anastasia was inspected by a United States steamboat inspector on January 18, 1933. With regard to that inspection, Capt. Larimore, petitioner's Port Captain at Norfolk who had charge of such matters for petitioner, testified as follows: "On January 18th we had the annual inspection by the United States Steamboat Inspectors. I always go aboard the boats with the Inspectors, and at that time we gave her their inspection, as their inspection, in other words, deck, and also her caulking, which the Inspectors usually

have what they call a try-out. They try the caulking forward around the decks and on the side. They also inspect her anchors and her chains and her pumps, and also it is asked from the captain by the Inspectors the amount of water she makes per hour or in twenty-four hours."

When asked what the condition of the Anastasia was, he replied, "Good, just as good as we could possibly get the boat and as thoroughly seaworthy as we can expect one to be."

Petitioner's Port Captain further testified, in substance, that on that inspection he personally examined the shackle pin in the connecting shackles to the vessel's anchor, the pin on the shank shackle, the windlass, and pumps, examined and operated by use of about sixty pounds pressure the steam pumps which were found in good condition, went over the decks to sound the caulking, tested by use of a "tryer" the seams all over the deck, examined the nine hatches, lifeboat equipment, life preservers, the steering gear (including a spare set of wheel ropes), and examined from a launch the vessel's broad sides; that the 2½-inch steam line running from boiler to her after pumps and capstan under deck was examined and found to be in good condition after it had been repaired in December, 1932, when a slit which is not unusual in such line was found in same causing the line to leak; that when the ends of the wooden hatch covers got broken off, minor repairs thereto were made on board the vessel by the Captain with lumber stored aboard for that purpose; that he examined the bulkhead at the chain locker, found same to be "eight by ten inch beams as far as the floor of the engine room, 'tween decks, caulked on each side"; that the chain locker was watertight, but *the hatch covers were not put on the hatches to see if they fitted properly when this inspection was made, but were found to be in good condition;* that the bunker plates on the Anastasia (which at first were flush with the deck and subsequently raised 4½ to 5 inches from the deck in order to keep the edges from being broken off by men when loading coal, and not for the purpose of preventing inflow of water in a seaway) were never tested as to watertightness between September 21st and the time of the sailing on the fatal voyage; that the boiler hatch was not tested for watertightness by using a hose on the deck to see whether it was watertight before this particular voyage, but was found upon inspection to be thoroughly caulked and in good condition; that covers for the chain ports, last seen by witness on January 18th which are under the wildcats (windlass) where the chain goes down under deck on the forward part of the vessel, were cast steel, ½ inch in thickness with a slot to go over the chain; that it was customary to put these covers over the chain ports when the vessel sails up the coast; that it would not be possible for water which came on deck from a sea to run through the hawse pipe which is practically covered up by the fluke of the anchor, and get inside the vessel in any way; that the ground tackle (anchor and anchor chains including the steering gear) are gone over, according to the records of the Southern Transportation Company, every three to six months and pulled out annually to clean out the chain lockers and go over the shackle pins; and that the anchors used were patent anchors, having 105 fathoms to each anchor, on a three-quarter inch chain and were last seen on January 18, 1933, the time of the annual inspection in question.

The steamboat inspector corroborated petitioner's Port Captain with regard to the inspection made on January 18th. The inspector testified that he found the condition of the barge to be "No. 1, good enough for me to give her a certificate of inspection, a seaworthy certificate." The certificate issued pursuant to this inspection is in evidence.

The inspection thus relied on to show that petitioner, the transportation company, exercised due diligence to make the tug and barge in all respects seaworthy and properly manned, equipped, and supplied and that the barge was in fact in all respects in seaworthy condition when she sailed from Norfolk on January 23d, was made on the 18th, five days before the voyage was commenced. At that time the barge was light and lying in the anchorage off the Norfolk & Western Railway coal piers where she subsequently loaded her cargo of 2,171 tons of coal. It does not appear, however, that any inspection of the barge was made after she was loaded or that any one examined her before the voyage was commenced to ascertain whether or not she was overloaded. The master of the tug said that he looked at the barge before sailing and that she appeared to be all right, but he did not go aboard her.

The questions presented are:

1. Was the loss of the Anastasia due to unseaworthy condition or to perils of the sea?

2. Did the transportation company exercise due diligence to make the barge Anastasia "in all respects seaworthy and properly manned, equipped and supplied" before that vessel sailed from Norfolk?

1. With respect to the first query, it will be noted that all of the witnesses called by petitioner, who were in the storm of January 25–26th, have described it as being unusually severe. The masters of the tug and the surviving barges are emphatic in their testimony to that effect. They assert not only that the wind was of unprecedented fury, but that due to shifts in direction it caused cross seas which added greatly to their difficulties. Capt. Kelly, the master of the Ontario, a veteran who had followed the sea over 50 years and who described himself as having "never worked a day on land," testified that it was the worst storm in his long experience. Against this testimony, the claimant produced no witnesses who were in the storm. It did, however, offer some evidence of the velocity of the wind, as recorded at one or more stations on the New Jersey Coast. The dramatic descriptions of the storm, especially those given by Capts. Powers and Kelly, would be much more impressive did not the evidence reveal that the Anastasia alone suffered disaster and that her disaster occurred under the peculiar circumstances disclosed by the testimony of petitioner's own witnesses.

As already pointed out, both the Ontario and Charleston survived the storm, and were not much the worse for the experience. The testimony of their masters leaves little doubt that their damage was comparatively light and that the quantity of water taken by each barge was not alarming or dangerous. The fear of Capt. Kelly of the Ontario when he remarked to himself while his barge was adrift, "I have made one trip too many," had reference solely to the danger of his vessel being beached on the New Jersey shore, not that he entertained any fear his barge would not be able to stand the storm itself. On the 25th the wind began to freshen shortly after noon. It gradually increased in velocity until the peak of the storm was reached in the early morning of the 26th, approximately 12 to 15 hours afterwards. The weather at 2:30 p. m. on the 25th was described by Capt. Kelly as "getting a little kind of hazy then, the wind was freshening up and the sea was getting a little higher." The difficulties under which the Anastasia was then laboring have already been mentioned. The master of the tug fixes that time as 3:10 p. m., while Capt. Kelly fixes it at 2:30 or probably at 2 p. m. The difference of an hour is not especially material, but I consider the testimony of Capt. Kelly to be more accurate, he being in a sense corroborated by his mate in the pilot house, who, when Capt. Kelly awoke at 2:30 p. m. and observed the change in the course of his vessel, informed Kelly that the Ontario had been headed directly east ever since 2 o'clock. The evidence signally fails to establish that the wind had then attained any great velocity. The master of the tug says the wind did not reach hurricane velocity until 8 or 9 o'clock that night, at which time he estimates that the velocity was 40 to 45 miles an hour. No witness gave any estimate in miles of the velocity from 2 to 4 p. m. of the 25th, but it evidently did not exceed 20 to 25 miles an hour when the tug changed its course, and headed into the wind. At that time the sea, according to the master of the tug, was washing clear over the decks of the Anastasia and threatening the hatch covers, so that the tug's master considered it necessary to slow down to half-speed and later to use merely enough power to hold the barges. There is no intimation that either of the other barges was experiencing difficulty or was not fully able to proceed on the voyage. So we have presented the case of a barge which for some reason could not proceed through a sea raised by a wind of only 20 to 25 miles velocity without serious danger of having its hatch covers washed away.

At the time the tug slowed down, the tow was only 40 to 45 miles from Brooklyn. On the 26th the tug made that trip light in four hours. The master explained his ability to do so by the fact that at least 20 miles of the 40 to 45 miles was in smooth water. Had the Anastasia been able as the other barges were to proceed in the afternoon and early night of the 25th, it is clear that the tow could have continued on the voyage at least 6 or 7 hours before the wind ever attained hurricane force. And the conclusion is unavoidable that had the Anastasia been able to proceed, the tow should have reached more protected waters in ample time to avoid the worst of the

storm altogether. Winds of 20 to 30 miles or even of 40 to 45 velocity are not of infrequent occurrence on the Atlantic Coast between January 1st and April. They are to be expected from time to time. And a barge that could neither proceed through a wind of not over 20 to 30 miles without imminent danger of her hatch covers being washed away nor safely ride out the storm, as was the case of the Anastasia, can hardly be said to have been seaworthy when it sailed.

■ If the vessel is not sufficiently seaworthy to withstand a storm of ordinary intensity, the fact that the particular storm may have been of unusual intensity would not seem to excuse the owner. In Atlantic Transport Co. v. Rosenberg Bros. & Co. (C. C. A. 9th) 34 F.(2d) 843, at page 845, where a somewhat similar situation was presented, it was said by Circuit Judge Wilbur: "In view of these circumstances, it is clear that the storm was of such violence and at such a time as to constitute a peril of the sea, exempting the shipowner from liability in the event that the ship was seaworthy. *If the ship was not seaworthy within the meaning of the rule on that subject, so that the cargo was liable to be damaged by a storm of ordinary intensity, the fact that the particular storm which did the damage was of extraordinary violence would not exempt the owner from liability.*" (Italics supplied.)

Also, see cases cited in this case with reference to the principle set forth above. In The Turret Crown (C. C. A. 2) 297 F. 766, at page 776 (certiorari denied [1924] 264 U. S. 591, 44 S. Ct. 403, 68 L. Ed. 856), Circuit Judge Manton, speaking for the court, said: "The mere fact that the vessel encountered heavy weather is no defense to the claims for damage to cargoes, if any defect or unseaworthy condition of the vessel existed."

In The Charles Rohde (D. C. Md.) 8 F.(2d) 506, at page 507, Judge Soper said: "But irrespective of the weather, the exception is of no avail if the owners fail to exercise due diligence to make the vessel seaworthy." See, also, The Viking (C. C. A. 6th) 271 F. 801, 802; California & Hawaiian Sugar Refining Corp. v. Rideout (C. C. A. 9th) 53 F.(2d) 322; Sabine Towing Co. v. Brennan (C. C. A. 5th) 72 F.(2d) 490.

2. Did the transportation company exercise due diligence to make the barge Anastasia in all respects seaworthy and properly manned, equipped, and supplied before she sailed from Norfolk?

■ It seems to the court that this query must be answered in the negative. The evidence with regard to the inspection which was made of the Anastasia on January 18, 1933, has been stated at length and need not be repeated. On behalf of claimant, it is earnestly urged that this inspection amounted to nothing more than the usual routine incident to an owner's obtaining a certificate of seaworthiness from the steamboat inspectors. In the view that the court takes of the case, it does appear to be necessary to decide whether that contention is sound or not.

The inspection under consideration was made on January 18th at which time the Anastasia was light and at anchor in Norfolk Harbor. Afterwards the barge received a cargo of 2,171 tons of coal, approximately her full carrying capacity. One or two witnesses referred in a general way to the Anastasia as having been built to carry 2,500 tons, but the more accurate testimony of Mr. Barnes, an official of the transportation company, gives her carrying capacity as "around 2,200 tons, between 2,100 and 2,200 tons." As already observed, no inspection or examination of the Anastasia was ever made with the view of determining whether or not she was overloaded, or was loaded so heavily as to give her too little freeboard for rough seas such as were reasonably to be expected on such a voyage at that season, or whether her hatch covers were securely fastened after she had finished loading. Had the barge sailed light or had she been loaded at the time the inspection was made on the 18th, the court would probably not attach so much importance to this omission. But adding 2,171 tons to the Anastasia's burden undoubtedly greatly reduced the freeboard at her beam, otherwise she would not have been washing badly with a beam sea going clear over her and endangering the hatch covers early in the afternoon of the 25th, as related by the master of the tug. These uncontroverted facts appearing as they do from the testimony of petitioner's witnesses leave slight doubt that the Anastasia was too heavily laden when she sailed from Norfolk on the 23d or that her hatch covers were not securely fastened or both. A reasonable inspection of the Anastasia after she was loaded and immediately before she sailed by a person com-

petent and experienced in such matters no doubt would have disclosed that situation.

■ The seaworthiness of the vessel at the moment of breaking ground is the decisive test. In Cullen Fuel Co. v. W. E. Hedger, Inc., 290 U. S. 82, at page 89, 54 S. Ct. 10, 11, 78 L. Ed. 189, Mr. Justice Roberts in delivering the opinion of the court said: "The petitioner urges that the denial of limitation in cases like this will sweep away much of the protection afforded to ship owners by the acts of Congress. But this view disregards the nature of the warranty. The fitness of the ship at the moment of breaking ground is the matter warranted, and not her suitability under conditions thereafter arising which are beyond the owner's control. Compare Armour & Co. v. Fort Morgan S. S. Co., 270 U. S. 253, 46 S. Ct. 212, 70 L. Ed. 571; The Ice King (C. C. A.) 261 F. 897; The Soerstad (D. C.) 257 F. 130."

In The Newport (C. C. A. 9th) 7 F.(2d) 452, at page 454, the principle above stated was laid down by Circuit Judge McCamant, as follows:

"In International Co. v. Farr Co., 181 U. S. 218, 21 S. Ct. 591, 45 L. Ed. 830, Mr. Chief Justice Fuller said: 'Seaworthiness at the commencement of the voyage is a condition precedent.' 'Fault in management is no defense, when there is lack of due diligence before the vessel breaks ground.' It is held that the warranty of seaworthiness applies *before the commencement of the voyage and until it is actually commenced.*'

"The owner is chargeable with the duty to furnish a seaworthy vessel 'at the commencement of the voyage,' Carver on Carriage by Sea (6th Ed.) § 18; 'at the time she sails,' McFadden v. Blue Star Line, 10 Asp. N. S. 55, 58; Sumner v. Caswell (D. C.) 20 F. 249, 252; In re Meyer (D. C.) 74 F. 881, 885; 'when she breaks ground,' The Eugene Vesta (D. C.) 28 F. 762; Bowring v. Thebaud, 56 F. 520, 5 C. C. A. 640; 'at the beginning of her voyage,' The Silvia, 171 U. S. 462, 464, 19 S. Ct. 7, 43 L. Ed. 241; The Willdomino (C. C. A.) 300 F. 5, 10, 11; 'before the commencement of the voyage and until it is actually commenced,' Kaufer Co. v. Luckenbach Steamship Co. (D. C.) 294 F. 978."

"While the question is not discussed, the following cases from this Circuit support this principle: The Pehr Ugland (D. C. Va.) 271 F. 340, appeal dismissed (C.

C. A. 1921) 277 F. 1019, and Porter v. Bank Line (The Poleric) (D. C.) 17 F. (2d) 513, affirmed (C. C. A. 4th) 25 F.(2d) 843.

"See, also, Insurance Co. of North America v. North German Lloyd Co. (C. C. A.) 110 F. 420; Pendleton v. Benner Line, 246 U. S. 353, 38 S. Ct. 330, 62 L. Ed. 770; The C. W. Elphicke (C. C. A.) 122 F. 439; The R. P. Fitzgerald (C. C. A.) 212 F. 678, certiorari denied, 234 U. S. 757, 34 S. Ct. 675, 58 L. Ed. 1579; The G. R. Crowe (C. C. A.) 293 F. 506, certiorari denied (1924) 264 U. S. 586, 44 S. Ct. 335, 68 L. Ed. 862; The Indrapura (C. C. A.) 190 F. 711; The Jeannie (D. C.) 225 F. 178, reversed on other grounds (C. C. A. 1916) 236 F. 463; Palmer & Parker Co. v. U. S. (D. C.) 10 F.(2d) 214; In re O'Donnell (C. C. A.) 26 F.(2d) 334, reversed on other grounds (C. C. A.) 34 F.(2d) 925; The Josephine (C. C. A.) 49 F.(2d) 207, and The Oritani (D. C.) 40 F.(2d) 522.

■ 3. The petitioner prays that its liability be limited to the value of the Anastasia. While petitioner is entitled to limit its liability, I think it is manifest from the circumstances shown by the evidence that such limitation should not be less than the value of the entire tow, which includes the tug and the two barges which survived the storm. It should not be confined to the Anastasia alone, which barge was a total loss. While the tug was the active agent in charge of the flotilla, the fact that the Ontario and Charleston were fastened to the Anastasia is not to be overlooked. The extra burden which those barges imposed upon the Anastasia did not lighten the latter's difficulties on the voyage. On the contrary, it is not improper to assume that the added burden of the two barges reduced the freeboard of the Anastasia and to that extent added to her unfitness. It is true that the barges Ontario and Charleston retarded rather than expedited the transportation of the coal. Nevertheless, considered as a whole, the tug and the three barges constituted the effective instrumentality selected by the transportation company to perform its undertaking to transport the coal from Norfolk to New York. In Sacramento Nav. Co. v. Salz, 273 U. S. 326, 332, 47 S. Ct. 368, 370, 71 L. Ed. 663, it is said: "Liverpool, etc., Nav. Co. v. Brooklyn Term'l, 251 U. S. 48, 40 S. Ct. 66, 64 L. Ed. 130, also relied upon by respondent, is not to the contrary. There the libel was for a collision with petition-

er's steamship, the moving cause of which was respondent's steam tug, proceeding up the East River, with a loaded car float lashed to one side and a disabled tug to the other, all belonging to respondent. The car float came into contact with the steamship; but the court said it was a passive instrument in the hands of the tug and did not affect the question of responsibility. The controversy arose upon a claim to limit liability, petitioner contending that the entire flotilla should have been surrendered. This court held that it was necessary to surrender only the active tug, saying 'that for the purposes of liability the passive instrument of the harm does not become one with the actively responsible vessel by being attached to it.' But this is far from saying that the entire flotilla might not be regarded as one vessel for the purposes of the undertaking in which the common owner was engaged at the time of the collision. The distinction seems plain. There the libel was for an injury to a ship in no way related to the flotilla. It was a pure tort; no contractual obligations were involved; and the simple inquiry was, What constituted the 'offending vessel'? Here we must ask, What constituted the vessel by which the contract of transportation was to be effected? a very different question. If the British ship, which here was struck by the barge, were suing to recover damages, and a limitation of liability were sought by the owner of the tug and barge, the Liverpool Case would be in point. *But the present libel is for a loss of cargo, and falls within the principle of The Columbia, supra* [(C. C. A.) 73 F. 226] *where, upon facts substantially identical with those here, a surrender was required of the combined means by which the company undertook the transportation of the cargo."*

In The Columbia (C. C. A. 9th) 73 F. 226, at page 238, cited by the Supreme Court in Sacramento Nav. Co. v. Salz, supra, it was said:

"In the present case, the barge and tug had the same owner, and both were operated by the same carrier. In the voyage, both were necessarily under the control of the master of the tug. They constituted the instrument of carriage, to which the wheat was liable for the service, and on which the owners of the cargo had a lien for the due performance of the contract of carriage. * * *

"The court below held that the collapsing of the barge was occasioned by the negligent shifting of some sacks of wheat by the master of the barge, and that that act of his was the proximate cause of the loss and damage in question. But no question of proximate cause, we think, arises in the case, for the reason that the tug and barge are, in law, considered one vessel, for the purpose of the voyage in question, and, whether the accident giving rise to the loss and damage be directly attributable to the acts of the master of the barge, or to those of the master of the tug, it is equally the negligence of the carrier, for which it contracted to be liable."

See, also, The Alvah H. Boushell (C. C. A. 4th) 38 F.(2d) 980; The Northern Belle, 9 Wall. 526, 19 L. Ed. 746; Sturgis v. Boyer, 24 How. 110, 16 L. Ed. 591; The Merrimac, 2 Sawy. 586, 595, Fed. Cas. No. 9,478; The Bordentown (D. C.) 40 F. 682, 686; The E 270 (D. C.) 16 F.(2d) 1005; Thompson Towing & Wrecking Ass'n v. McGregor (C. C. A. 6th) 207 F. 209; In re O'Donnell (C. C. A. 2d) 26 F.(2d) 334; Shipowners', etc., v. Hammond Lumber Co. (C. C. A. 9th) 218 F. 161; The Arturo (D. C.) 6 F. 308; The Anthracite (C. C. A.) 168 F. 693; The Transfer No. 21 (C. C. A. 2d) 248 F. 459; Insurance Co. of North America v. Southern Transp. Co. (The Bathgate), 25 F.(2d) 103 (C. C. A. 3d); Tice Towing Line v. James McWilliams Blue Line (D. C.) 51 F.(2d) 243; In re W. E. Hedger Co., Inc. (C. C. A. 2d) 59 F.(2d) 982; The Carroll (D. C.) 60 F (2d) 985; Standard Dredging Co. v. Kristiansen (C. C. A. 2d) 67 F.(2d) 548; The Civilta and The Restless, 103 U. S. 699, 26 L. Ed. 599; The Nettie Quill (D. C.) 124 F. 667; The Seven Bells (C. C. A.) 241 F. 43; The Fred W. Chase (D. C.) 31 F. 91.

The court's conclusions therefore are: (1) That the barge Anastasia was not in a seaworthy condition when she sailed from Norfolk on January 23, 1933; (2) that a reasonable inspection of that barge immediately before she sailed would have disclosed her unseaworthy condition; and (3) that recovery against petitioner will be limited to the value of the entire tow immediately following the loss of the Anastasia.

A decree in conformity with these conclusions will be entered when presented.